Michael C. Harwood (mharwood@kasowitz.com)
Adam L. Shiff (ashiff@kasowitz.com)
Jeffrey R. Gleit (jgleit@kasowitz.com)
Michele L. Angell (mangell@kasowitz.com)
KASOWITZ, BENSON, TORRES
 & FRIEDMAN LLP
1633 Broadway
New York, New York 10019
(212) 506-1700

Counsel for Plaintiffs

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

---

CAPMARK FINANCIAL GROUP INC.; SUMMIT
CREST VENTURES, LLC; CAPMARK CAPITAL
LLC (F/K/A CAPMARK CAPITAL INC.); CAPMARK
FINANCE LLC (F/K/A CAPMARK FINANCE INC.);
COMMERCIAL EQUITY INVESTMENTS LLC
(F/K/A COMMERCIAL EQUITY INVESTMENTS,
INC.); MORTGAGE INVESTMENTS, LLC; NET
LEASE ACQUISITION LLC; SJM CAP, LLC;
CAPMARK AFFORDABLE EQUITY HOLDINGS
LLC (F/K/A CAPMARK AFFORDABLE EQUITY
HOLDINGS INC.); CAPMARK REO HOLDING LLC;
AND CAPMARK INVESTMENTS LP,

       Plaintiffs,

    vs.

GOLDMAN SACHS CREDIT PARTNERS
L.P., GOLDMAN SACHS CANADA
CREDIT PARTNERS CO., GOLDMAN
SACHS MORTGAGE COMPANY, AND
GOLDMAN SACHS LENDING
PARTNERS LLC,

       Defendants.

---



JUDGE SWEET

11 CIV 7511

Civil Action No.

RECEIVED
OCT 2 4 2011
U.S.D.C. S.D. N.Y.
CASHIERS

**Jury Trial Demanded**

## COMPLAINT TO AVOID AND RECOVER TRANSFERS
## AND PAYMENTS PURSUANT TO 11 U.S.C. §§ 547 AND 550

Capmark Financial Group Inc. ("CFGI"), Summit Crest Ventures, LLC, Capmark Capital

LLC (f/k/a Capmark Capital Inc.), Capmark Finance LLC (f/k/a Capmark Finance Inc.),

Commercial Equity Investments LLC (f/k/a Commercial Equity Investments, Inc.), Mortgage

Investments, LLC, Net Lease Acquisition LLC, SJM Cap, LLC, Capmark Affordable Equity

Holdings LLC (f/k/a Capmark Affordable Equity Holdings Inc.), Capmark REO Holding LLC,

and Capmark Investments LP (collectively, with CFGI, the "Plaintiffs"), by and through their

undersigned counsel, hereby file this Complaint to Avoid and Recover Transfers and Payments

Pursuant to 11 U.S.C. §§ 547 and 550 against Goldman Sachs Credit Partners, L.P., Goldman

Sachs Canada Credit Partners Co., Goldman Sachs Mortgage Company, and Goldman Sachs

Lending Partners LLC (collectively, the "Defendants," and together with all their affiliates,

"Goldman Sachs") and, in support thereof, allege as follows:

### INTRODUCTION[1]

1.      This is an action to avoid and recover as insider preferences approximately $147

million in transfers made by the Plaintiffs' predecessors (the "Debtors"), to the Defendants,

Goldman Sachs entities, within a year before the Debtors filed their petitions for reorganization

in bankruptcy.  Plaintiffs are the reorganized debtors which retained their right to bring this

action in accordance with their confirmed chapter 11 plan of reorganization.

2.      The Debtors entered into two Pre-Petition Credit Facilities in March 2006, under

which they incurred approximately $8.7 billion in unsecured debt from various lenders,

---

[1]      Capitalized terms used but not defined herein shall have the meanings assigned to them in the body of this
Complaint.

including Defendants. In May 2009, the Debtors entered into a $1.5 billion Secured Credit Facility, pursuant to which they incurred $1.5 billion in Secured Debt from various existing lenders to the Pre-Petition Credit Facilities, and used all of the proceeds to pay these existing lenders, including Defendants, a like amount. As a result, based on the amount of the Secured Credit Facility Goldman Sachs committed to, Goldman Sachs received approximately $140 million, plus approximately $7 million of CFGI's cash, to reduce its unsecured loan to the Debtors and in its place held a new secured loan that was much better positioned to receive payment in full when the Debtors entered bankruptcy proceedings only five months later.

3.      At the time of the new Secured Credit Facility transaction, Goldman Sachs was also a member of a limited liability company that owned 75% of CFGI (the parent company of the other Debtors), had appointed a member to CFGI's board of directors who was also a managing director of The Goldman Sachs Group, Inc. and/or Goldman Sachs & Co., and was a lender under the Pre-Petition Credit Facilities. Despite these conflicts and close connections -- indeed, as a result of the influence and insider status that its multiple simultaneous roles created -- Goldman Sachs actively and directly participated in internal meetings and discussions that led to the Secured Credit Facility, which gave it preferential treatment as a creditor, and played a role for the Debtors in considering other strategic alternatives to the Secured Credit Facility that would not have resulted in this payment that was to the Defendants' benefit.

4.      As a result, Plaintiffs bring this action seeking avoidance and recovery of all preferential payments made to Defendants or for Defendants' benefit under the Pre-Petition Credit Facilities from the proceeds of the Secured Credit Facility and CFGI's cash payments, in accordance with sections 547 and 550 of the Bankruptcy Code.

## JURISDICTION AND VENUE

5.      This Court has jurisdiction over this matter pursuant to 28 U.S.C. § 1334(b) because the claims asserted herein arise under, in, and are related to the Plaintiffs' chapter 11 bankruptcy cases. This Court also has jurisdiction under 28 U.S.C. §§ 1331 and 1332. Venue is proper pursuant to 28 U.S.C. § 1391(b) based on Defendants' principal place of business and because most of the events surrounding the repayment of the Defendants occurred in this District.

## THE PARTIES

### A.      Plaintiffs

6.      Plaintiffs are CFGI and ten (10) of its reorganized debtor affiliates. All references to CFGI and its reorganized debtor affiliates as they existed prior to the effective date of the Third Amended Joint Plan of Capmark Financial Group, Inc. and certain of its affiliated proponent debtors under chapter 11 of the Bankruptcy Code (the "Plan") shall be to CFGI and its affiliates as they existed prior to consummation of the Plan.

7.      CFGI is a Nevada corporation with its principal place of business located at 116 Welsh Road, Horsham, Pennsylvania, 19044.

8.      Summit Crest Ventures, LLC is a Delaware Limited Liability Company with its principal place of business located at 116 Welsh Road, Horsham, Pennsylvania, 19044.

9.      Capmark Capital LLC (f/k/a Capmark Capital Inc.) is a Delaware Limited Liability Company with its principal place of business located at 116 Welsh Road, Horsham, Pennsylvania, 19044.

10.     Capmark Finance LLC (f/k/a Capmark Finance Inc.) is a California Limited Liability Company with its principal place of business located at 116 Welsh Road, Horsham, Pennsylvania, 19044.

11.     Commercial Equity Investments LLC (f/k/a Commercial Equity Investments, Inc.) is a Delaware Limited Liability Company with its principal place of business located at 116 Welsh Road, Horsham, Pennsylvania, 19044.

12.     Mortgage Investments, LLC is a Delaware Limited Liability Company with its principal place of business located at 116 Welsh Road, Horsham, Pennsylvania, 19044.

13.     Net Lease Acquisition LLC is a Delaware Limited Liability Company with its principal place of business located at 116 Welsh Road, Horsham, Pennsylvania, 19044.

14.     SJM Cap, LLC is a Delaware Limited Liability Company with its principal place of business located at 116 Welsh Road, Horsham, Pennsylvania, 19044.

15.     Capmark Affordable Equity Holdings LLC (f/k/a Capmark Affordable Equity Holdings Inc.) is a Delaware Limited Liability Company with its principal place of business located at 116 Welsh Road, Horsham, Pennsylvania, 19044.

16.     Capmark REO Holding LLC is a Delaware Limited Liability Company with its principal place of business located at 116 Welsh Road, Horsham, Pennsylvania, 19044.

17.     Capmark Investments LP is a Delaware Limited Partnership with its principal place of business located at 116 Welsh Road, Horsham, Pennsylvania, 19044.

**B.      Defendants**

18.     Upon information and belief, Defendant Goldman Sachs Credit Partners L.P. is a Bermuda limited partnership with its principal place of business in New York, New York.

19.     Upon information and belief, Defendant Goldman Sachs Canada Credit Partners Co. is a Nova Scotia corporation with a principal place of business in Toronto, Ontario, Canada, that also transacts business and has officers in New York, New York.

20.     Upon information and belief, Defendant Goldman Sachs Mortgage Company is a New York company with its principal place of business in New York, New York.

21.     Upon information and belief, Defendant Goldman Sachs Lending Partners LLC is a Delaware limited liability company with its principal place of business in New York, New York.

## PROCEDURAL BACKGROUND

22.     On October 25, 2009 (the "Petition Date"), each of the Debtors other than Capmark Investments LP and Protech Holdings C, LLC filed voluntary petitions for relief under chapter 11 of title 11 of the United States Code (the "Bankruptcy Code") in the United States Bankruptcy Court for the District of Delaware (the "Bankruptcy Court").[2]  On January 15, 2010, Capmark Investments LP, a wholly-owned subsidiary of CFGI, commenced its voluntary case under chapter 11 of the Bankruptcy Code.

---

[2]     The Debtors in the chapter 11 cases were: CFGI, Summit Crest Ventures, LLC, Capmark Capital Inc., Capmark Finance Inc., Commercial Equity Investments, Inc., Mortgage Investments' LLC, Net Lease Acquisition LLC, SJM Cap, LLC, Capmark Affordable Equity Holdings Inc., Capmark REO Holding LLC, Paramount Managing Member AMBAC II, LLC, Paramount Managing Member AMBAC III, LLC, Paramount Managing Member AMBAC IV, LLC, Paramount Managing Member AMBAC V, LLC, Paramount Managing Member LLC, Paramount Managing Member II, LLC, Paramount Managing Member III, LLC, Paramount Managing Member IV, LLC, Paramount Managing Member V, LLC, Paramount Managing Member VI, LLC, Paramount Managing Member VII, LLC, Paramount Managing Member VIII, LLC, Paramount Managing Member IX, LLC, Paramount Managing Member XI, LLC, Paramount Managing Member XII, LLC, Paramount Managing Member XVIII, LLC, Paramount Managing Member XIV, LLC, Paramount Managing Member XV, LLC, Paramount Managing Member XVI, LLC, Paramount Northeastern Managing Member, LLC, Capmark Affordable Properties Inc., Paramount Managing Member XXIII, LLC, Paramount Managing Member XXIV, LLC, Paramount Managing Member 30, LLC, Paramount Managing Member 31, LLC, Paramount Managing Member 33, LLC, Broadway Street California, L.P., Broadway Street 2001, L.P., Broadway Street XV, L.P., Broadway Street XVI, LP., Broadway Street XVIII, L.P., Broadway Street Georgia I, LLC, Capmark

23.     On August 24, 2011, the Bankruptcy Court confirmed the Plan. Pursuant to Section 4.11 of and Exhibit 4.11 to the Plan, the claim by the Debtors against Defendants was preserved, and this action remains an asset of and vested in the Plaintiffs, and the Plaintiffs are authorized to bring this action for the benefit of the reorganized Debtors. The Plan became effective on September 30, 2011.

24.     Upon the effective date of the Plan, all prepetition claims against and equity interests in the Debtors were deemed cancelled and the Debtors' obligations in connection therewith were discharged. On account of a settlement approved by the Bankruptcy Court, all Lenders (as defined herein), including Defendants, received payment in cash of 91% of their allocable share of $1.5 billion on account of their claims under the Secured Credit Facility (as discussed and defined herein).[3] Under the Plan, unsecured claims, including the remaining balance on the 2006 Credit Facility (as defined herein), are expected to receive a distribution of approximately 56.7% of their claims. Thus, Defendants, who would have been wholly unsecured creditors but for the Secured Credit Facility, were significantly better off than the Debtors' unsecured creditors, as a result of the payments Defendants received from the proceeds of the Secured Credit Facility, and CFGI's cash payment made contemporaneously therewith, as discussed herein.

---

Managing Member 4.5 LLC, Capmark Affordable Equity Inc., Capmark Investments LP and Protech Holdings C, LLC.

[3]     Defendants, and Dune Real Estate Fund LP and Dune Real Estate Parallel Fund LP (collectively, "Dune"), were expressly carved out of the settlement with respect to insider preference claims the Debtors alleged against them. The Debtors later settled with Dune. Dune and Defendants are the only Lenders against whom the Debtors alleged insider preferences in connection with the proceeds of the Secured Credit Facility.

## FACTUAL BACKGROUND

### A.   The 2006 Transactions

25.     On March 23, 2006, a group of private equity investors, including affiliates of Goldman, Sachs & Co. – namely, GS Capital Partners V Fund, L.P; GS Capital Partners V Offshore Fund, L.P.; GS Capital Partners V GmbH & Co. KG; and GS Capital Partners V Institutional, L.P. (the "Goldman Affiliates") – formed a limited liability company ("GMACCH Investor LLC") which acquired a 75% controlling ownership stake in Debtor CFGI from CFGI's former parent through a leveraged buyout transaction.

26.     Each of the Goldman Affiliates is a member of GMACCH Investor LLC.  Thus, Goldman Sachs, through its membership in GMACCH Investor LLC, was a majority owner of CFGI.

27.     To finance the March 23, 2006 leveraged buyout transaction in which Goldman Sachs and GMACCH Investor LLC acquired the 75% ownership of CFGI, the Debtors incurred approximately $8.7 billion of unsecured debt at the closing.  Specifically, CFGI and certain of its subsidiaries entered into two unsecured debt facilities (the "Pre-Petition Credit Facilities"): (i) an Unsecured Credit Facility in the principal amount of $5.5 billion (as amended from time to time, the "2006 Credit Facility"),[4] the terms of which were governed by the Credit Agreement among CFGI, certain of its subsidiaries, the various lenders including Defendants, Citibank N.A. ("Citibank") as Administrative Agent, J.P. Morgan Securities Inc. as Syndication Agent, and Credit Suisse, Deutsche Bank Securities Inc., Goldman Sachs Credit Partners L.P., and The Royal Bank of Scotland plc as Documentation Agents dated as of March 23, 2006 (as

---

[4]     The 2006 Credit Facility was comprised of various sub-facilities, including (i) several term loans totaling $2.75 billion and (ii) several revolving lines of credit totaling $2.75 billion.

amended from time to time, the "Credit Agreement"); and (ii) an Unsecured Bridge Loan

Facility in the principal amount of $5.25 billion (as amended from time to time, the "Bridge

Loan"), the terms of which were governed by the Bridge Loan Agreement among CFGI, the

various lenders including Goldman Sachs Credit Partners L.P., Citicorp North America, Inc.

("Citicorp") as Administrative Agent, the same Syndication Agent and Documentation Agents,

and Citigroup Global Markets Inc., J.P. Morgan Securities Inc., Credit Suisse, Deutsche Bank

Securities Inc., Goldman Sachs Credit Partners L.P. and The Royal Bank of Scotland plc as

Joint Lead Arrangers and Joint Bookrunners, dated as of March 23, 2006 (as amended from

time to time, the "Bridge Loan Agreement").[5]

28.     CFGI and certain of its subsidiaries were borrowers (the "Borrowers") under the

Credit Agreement,[6] and CFGI guaranteed the obligations of each Borrower. Additionally, nine

of CFGI's direct and indirect subsidiaries (the "Guarantors") guaranteed CFGI's obligations

under the Credit Agreement pursuant to a separate guaranty agreement. CFGI was the sole

borrower under the Bridge Loan. The same Guarantors under the Credit Agreement also

guaranteed CFGI's obligations under the Bridge Loan pursuant to a separate guaranty

agreement.[7]  The Pre-Petition Credit Facilities were unsecured debt obligations that ranked *pari*

---

[5]     From time to time, the Debtors and their unsecured bank debt lenders entered into various amendments to the Pre-Petition Credit Facilities.

[6]     Credit Agreement Borrowers were: CFGI; Capmark AB No. 2 Limited; Capmark Bank; Capmark Bank Europe, Public Limited Company; Capmark Canada Limited; Capmark EI Ireland Limited; Capmark Finance Inc.; Capmark Funding Japan KK; Capmark Ireland Limited; Capmark Japan, KK; and SJM Cap, LLC.

[7]     Credit Agreement and Bridge Loan Guarantors were: Enableus, Inc.; Capmark Capital Inc.; Capmark Finance Inc.; Capmark Investments LP; Commercial Equity Investments, Inc.; Crystal Ball Holdings of Bermuda Limited; Mortgage Investments, LLC; Net Lease Acquisition LLC; and SJM Cap, LLC. Additional guarantors (the "Additional Guarantors") were added on the Credit Agreement and Bridge Loan as of May 29, 2009. Additional Guarantors became guarantors of CFGI's obligations under the Notes, as defined herein, on June 3, 2009. The Additional Guarantors were: Capmark Affordable Equity Holdings Inc.; Capmark REO Holding LLC; and Summit Crest Ventures LLC.

*passu* with all other unsecured obligations of CFGI. All Defendants were lenders under one or both of the Pre-Petition Credit Facilities.

29.    In May 2007, CFGI issued $2.55 billion of senior unsecured notes. The notes consisted of: (i) $850 million of Floating Rate Senior Notes Due May 10, 2010; (ii) $1.2 billion of 5.875% Senior Notes Due May 10, 2012; and (iii) $500 million of 6.300% Senior Notes Due May 10, 2017 (collectively, the "Notes"). Each series of Notes was issued pursuant to a separate indenture dated as of May 10, 2007 (collectively, the "Indentures") between CFGI, the Guarantors, and Deutsche Bank Trust Company Americas as Indenture Trustee. Substantially all of the proceeds from the issuance of the Notes were used to repay a portion of the Bridge Loan.

30.    Prior to incurring the Secured Debt (as defined below) approximately $5.3 billion was outstanding under the 2006 Credit Facility, and the balance on the Bridge Loan was approximately $825 million.

31.    GMACCH Investor LLC had the right to designate a specified number of directors which constituted a majority of CFGI's board of directors (the "Board"), as provided in GMACCH Investor LLC's limited liability company and stockholder agreements.

32.    In November 2008, as a result of the Goldman Affiliates' membership in GMACCH Investor LLC, Goldman Sachs appointed Bradley J. Gross, who was a managing director of The Goldman Sachs Group, Inc. and/or Goldman Sachs & Co., to serve as its representative on the Board.

**B.    The 2009 Secured Credit Facility**

33.    In May 2009, CFGI, the Guarantors, the Additional Guarantors, and various lenders that held debt under one or both of the 2006 Credit Facility or Bridge Loan (the

"Lenders"), including Defendants, entered into a $1.5 billion secured term loan facility (the "Secured Credit Facility") whereby CFGI and certain other Debtor Guarantors incurred $1.5 billion in secured debt (the "Secured Debt") to pay down the unsecured debt held by the Lenders in substantially the same amount.

34.     The terms of the Secured Credit Facility were governed by the Term Facility Credit Agreement and Guaranty Agreement, dated May 29, 2009, among CFGI as Borrower, the Guarantor parties thereto, Citicorp as Administrative Agent, Citibank as Collateral Agent, JPMorgan Chase Bank, N.A. as Syndication Agent, the various Lenders including Defendants, and Citigroup Global Markets Inc. and J.P. Morgan Securities Inc. as Joint Lead Arrangers and Joint Bookrunners (the "Secured Credit Facility Agreement"). At the same time, CFGI also entered into the Security Agreement dated May 29, 2009, among CFGI, the grantors party thereto, and Citibank as Collateral Agent (the "Security Agreement").

35.     Each Guarantor executed the Secured Credit Facility Agreement, which obligated each Guarantor to repay the Secured Debt subject to certain limitations. Pursuant to the Security Agreement, (i) CFGI pledged and granted security interests on all of CFGI's U.S. and Canadian mortgage loan assets and foreclosed real estate (excluding assets held by Capmark Bank) and the proceeds of such assets, and (ii) each Guarantor granted security interests on certain of its assets to secure its obligations to repay the Secured Debt under the Secured Credit Facility Agreement.

36.     The $1.5 billion from the Secured Credit Facility, along with $75 million of cash from CFGI, was used to pay down a corresponding amount of outstanding debt under the Pre-Petition Credit Facilities. Specifically, Section 2.13 of the Secured Credit Facility Agreement

expressly mandated that the proceeds be used only to finance the repayment of the 2006 Credit Facility and Bridge Loan.

37.     All proceeds of the Secured Credit Facility were used to finance the repayment of unsecured debt under the Pre-Petition Credit Facilities, thereby replacing unsecured debt with debt secured by all of CFGI's U.S. and Canadian mortgage loan assets and foreclosed real estate (excluding assets held by Capmark Bank) and the proceeds of such assets.

38.     The Secured Credit Facility Agreement required a repayment of no less than $1.575 billion of the 2006 Credit Facility and Bridge Loan.  Defendants received approximately $139,126,393.95 from the Secured Credit Facility and approximately $6,956,319.70 from CFGI's $75 million cash payment.

39.     The repayment terms of the Secured Credit Facility were less favorable to the Borrowers than both the 2006 Credit Facility and Bridge Loan, including (a) interest at a higher potential "Base Rate," (b) the addition of an "Applicable Margin" of 1.5% per annum to the "Base Rate," and (c) an additional "Applicable Margin" of 2.5% per annum for "Eurodollar Rate Advances."

40.     All Defendants – each of which was also a lender under the 2006 Credit Facility and/or Bridge Loan – were Lenders under the Secured Credit Facility.  As a result of the May 2009 Secured Credit Facility, Defendants received a payment from CFGI of approximately $139,126,393.95, plus approximately $6,956,319.70 from CFGI's $75 million cash payment, on their portion of the Pre-Petition Credit Facilities.  Although Defendants also committed to lend a like amount in the Secured Credit Facility in the aggregate, their new loan was now fully secured and was governed by higher interest rates and other conditions more favorable to them as Lenders.

**C.      The Goldman Defendants' Involvement in the Secured Credit Facility**

41.      Mr. Gross actively and directly participated in the internal corporate activities that led to the Secured Credit Facility as a director of CFGI and a member of the Board's Special Committee (as defined below) created expressly for this purpose, and played a role for the Debtors in considering other strategic alternatives to the Secured Credit Facility, despite being a managing director of The Goldman Sachs Group, Inc. and/or Goldman Sachs & Co., whose affiliates were Lenders and equity holders, and the attendant conflicts of interest.

42.      As a result of turmoil in the credit markets and a decline in the value of the Debtors' mortgage-related assets, the Debtors found themselves in a challenging financial situation at the end of 2008. The Debtors expected to incur a substantial loss in the fourth quarter of 2008 (which ultimately exceeded $1 billion). Accordingly, the Debtors took steps to limit new commitments, cut expenses, and preserve liquidity, and began exploring alternatives aimed at extending maturity and potentially converting debt to equity to resize and stabilize their balance sheet for the long term. The Debtors' most pressing financial challenge in early 2009 was the impending March 23, 2009 due date for the remaining principal balance on the Bridge Loan.

43.      In connection therewith, the Board appointed a special committee to consider and evaluate strategic restructuring alternatives (the "Special Committee"). Mr. Gross served on the Special Committee despite the fact that Defendants were Lenders.

44.      The Special Committee oversaw negotiations with a pre-bankruptcy bank syndicate in connection with the Secured Credit Facility and related discussions. Negotiations between the bank syndicate and the Debtors took place from February to May 2009.

45.      Upon information and belief, Mr. Gross participated as a member of the full Board and the Special Committee from January through May 2009 in the Debtors' financial

restructuring efforts. During this critical time period, Mr. Gross was involved in discussions of

major decisions that affected and limited the Debtors' strategic alternatives to the Secured

Credit Facility, including the following:

(a)  The Debtors' decision to withdraw their application to become a bank holding company (February 25, 2009).

(b)  The Debtors' decision to reject the bank syndicate's proposal in February 2009 (February 25, 2009).

(c)  The Debtors' decision to reject a proposal by the bank syndicate that was received on March 13, 2009, but also to send a letter to the bank syndicate that the Board would continue working with the steering committee (March 15, 2009).

(d)  The Debtors' discussion about the bank syndicate proposal received on March 17, 2009, and the determination that the proposal did not adequately address the company's concerns (March 17, 2009).

(e)  The Debtors' decision authorizing a 25 bps fee (of the principal owed) to extend the maturity date of the Bridge Loan for two weeks so negotiations could continue (March 19, 2009).

(f)  The Debtors' discussion of the revised term sheet received from the bank syndicate on March 27, 2009 and the company's counterproposal, which was unanimously approved by the Board (March 30, 2009).

(g)  The Debtors' discussion of the revised term sheet received from the bank syndicate on April 1, 2009 and the company's counterproposal, which was unanimously approved by the Board (April 3, 2009).

(h)  The Debtors' decision authorizing a 15 bps fee (of the principal owed) to extend the maturity date of the Bridge Loan to April 20, 2009, so that negotiations could continue (April 8, 2009).

(i)  The Debtors' discussion regarding the ongoing negotiations concerning the Counterproposal submitted on April 1, 2009 (April 8, 2009).

(j)  The Debtors' decision to approve supplemental Indentures (the "Supplemental Indentures"). This modification was required to close the Secured Credit Facility (May 19, 2009).

(k)  The Debtors' decision to approve amendments to the existing agreements that were required to enter into the Secured Credit Facility (May 20, 2009).

      (l)     The Debtors' decision to approve the Supplemental Indentures and adding entities as "Additional Subsidiary Guarantors" under the Indentures (May 28, 2009).

46.    Defendants had a designee on the Board, and access to the other members of the Board, which gave them the ability to influence the Debtors' decisions, in at least the following ways:

      (a)     As discussed below, employees of Defendants or their affiliates utilized Mr. Gross's position as a director of CFGI to bring to the Debtors' attention Defendants' own restructuring proposals.

      (b)     On February 19, 2009, with Nicole Agnew, an officer or employee of The Goldman Sachs Group, Inc. in attendance, Mr. Gross made a presentation to the Special Committee regarding an alternative illustrative financing construct prepared by The Goldman Sachs Group, Inc. designed to outline a secured financing arrangement that might be used to finance future bond tender offers. In connection therewith, Mr. Gross stated that such a construct could provide new liquidity but would need to be secured by adequate collateral.

      (c)     On February 25, 2009, Ms. Agnew again attended a Board meeting with Mr. Gross, in which negotiations with the Pre-Petition Credit Facility lenders were discussed.

      (d)     On March 9, 2009, Ms. Agnew attended a Special Committee meeting that Mr. Gross attended via teleconference.

      (e)     On April 17, 2009, Ms. Agnew attended a Board meeting where Mr. Gross was not in attendance, where Secured Credit Facility negotiations were discussed.

47.    Because of Mr. Gross's position on the Board and Special Committee, Defendants had access to information that other creditors did not, including but not limited to the fact that the Board was considering bankruptcy as early as February 2009.

48.    Both Mr. Gross and Ms. Agnew attended the meetings on February 2 and February 25, 2009, and Henry Cornell, another officer or employee of The Goldman Sachs Group, Inc., also attended on February 2.

49.     At the Board meeting on February 2, 2009, the general counsel to the Debtors advised the Board to engage restructuring counsel so the company would be prepared in the event a bankruptcy filing was necessary.

50.     Martin Bienenstock of Dewey & LeBoeuf discussed chapter 11 options at the Board meeting on February 25, 2009.

51.     During their August 20, 2009 Board meeting, the Board members, including Mr. Gross, were advised on potential preference actions and the Board's general fiduciary duties on filing for bankruptcy prior to expiration of the 90-day statutory non-insider preference period. Mr. Gross participated in the Board's calculation, and consideration of the effects of the 90-day statutory non-insider preference period on the debt repayments made from the proceeds of the Secured Credit Facility transaction on May 29, 2009.  Ultimately, the Board did not commence the Debtors' bankruptcy cases within the 90-day period.

52.     The 90-day statutory non-insider preference period for payments CFGI made with the proceeds of the May 2009 Secured Credit Facility expired in August 2009.  The Debtors filed for bankruptcy protection on October 25, 2009, approximately two months after the statutory non-insider preference period passed.

### D.     The Goldman Lenders and Goldman Affiliates

53.     The Goldman Affiliates and Goldman Lenders both operated for the benefit of one entity:  The Goldman Sachs Group, Inc.  Goldman Sachs's public website refers to one entity, "Goldman Sachs," and to Goldman Sachs's different practice areas, such as investment banking and merchant banking, as "divisions."

54.     Indeed, Goldman Sachs's public website makes clear that one of "Goldman Sachs' Compensation Principles" is that "[c]ompensation should reflect the performance of the firm as a whole."

16

55. Goldman Sachs's website encourages that "[e]mployees should think and act like long-term shareholders. Being significantly invested in our stock over time, as part of an individual's compensation, advances our partnership culture of stewardship for the firm."

56. In the Debtors' bankruptcy cases, "The Goldman Sachs Group, Inc.," rather than any particular Goldman Sachs entity that was a member of GMACCH Investor LLC, filed Goldman Sachs's declaration of status as a substantial equity holder of the Debtors in accordance with the Debtors' tax attribute procedures.

57. Upon information and belief, The Goldman Sachs Group, Inc. is ultimately responsible for all debt holdings of its affiliates.

58. The Goldman Sachs Group, Inc.'s 2010 10-K lists Goldman Sachs Credit Partners L.P, Goldman Sachs Mortgage Company, and Goldman Sachs Lending Partners LLC as "significant subsidiaries of The Goldman Sachs Group, Inc. as of December 31, 2010," and explains that "The Goldman Sachs Group, Inc. owns, directly or indirectly, at least 99% of the voting securities of each subsidiary."

59. Upon information and belief, all Goldman Sachs entities share common legal and risk management departments.

60. Goldman Sachs's website explains that "[t]he Legal Department plays an essential role in the formulation and implementation of the strategy of Goldman Sachs. The advice and counsel we provide *to all areas of the firm* is critical to maintaining our commitments . . . . Our goal is to provide legal advice that protects the firm's financial well-being and reputation" (emphasis added).

61.     Upon information and belief, it was public knowledge at Goldman Sachs that Goldman Sachs had a substantial ownership interest in, yet had made substantial loans to, the Debtors.

**E.     Goldman Sachs's Agency Positions**

62.     In connection with their equity and lending investment in CFGI, Goldman Sachs entities were granted multiple agency positions in the Debtors' debt and securities transactions from 2006 through the present.  Defendant Goldman Sachs Credit Partners L.P. was Documentation Agent for the 2006 Credit Facility, as well as Joint Lead Arranger and Bookrunner with respect to the Bridge Loan, and upon information and belief, received substantial fees for such positions.

63.     Goldman Sachs also acted as underwriter for the bonds the Debtors issued in 2007, a position for which it was highly compensated.

64.     At the end of the first quarter of 2007, the Debtors determined to retain a financial advisor to assist them in selling their stock, and chose Goldman Sachs.  Goldman Sachs worked on the project, which was ultimately abandoned, but there was never an engagement letter for such services, indicating that Goldman Sachs used its close relationships with the Debtors to obtain early insider access to influence the Debtors' financial transactions.

**FIRST CAUSE OF ACTION – AVOIDANCE OF PREFERENTIAL TRANSFERS**
**AGAINST THE DEFENDANTS AS STATUTORY INSIDERS**
**(11 U.S.C. § 547)**

65.     Plaintiffs restate and reallege the foregoing paragraphs, which are incorporated by reference as if set forth fully herein.

66.     Defendants all were lenders under the 2006 Credit Facility.  Defendants also all were Lenders under the Secured Credit Facility.

67.     Goldman Sachs Credit Partners L.P. was a lender under the Bridge Loan.

68.     Upon information and belief, the Goldman Affiliates held approximately a 19.8%

interest in GMACCH Investor LLC, which owned approximately 75.4% of the outstanding

common stock of CFGI.

69.     Since November 2008 and at the time of the Secured Credit Facility transaction,

Bradley J. Gross, a managing director of The Goldman Sachs Group, Inc. and/or Goldman

Sachs & Co., was a director of the CFGI Board as the designee of Goldman Sachs due to its

ownership interest in CFGI, as provided in GMACCH Investor LLC's limited liability company

and stockholder agreements.

70.     At all relevant times, Defendants were "statutory" insiders of the Debtors under

11 U.S.C. § 101(2) and (31).  Among other things:

      (a)     The Goldman Affiliates were members of GMACCH Investor LLC.

      (b)     Upon information and belief, the Goldman Affiliates as members of
GMACCH Investor LLC were generally provided with authority for
managing GMACCH Investor LLC.

      (c)     The Goldman Affiliates, as members of GMACCH Investor LLC, had the
power to appoint, and did appoint, a director to the Board of CFGI.

      (d)     The Goldman Affiliates, as members of GMACCH Investor LLC, were
insiders of GMACCH Investor LLC.

      (e)     GMACCH Investor LLC, because it held approximately 75.4% of CFGI's
stock, was an affiliate and thus an insider of CFGI.

      (f)     The Goldman Affiliates and their co-investors formed GMACCH Investor
LLC specifically to acquire CFGI stock as a group.  Thus, the Goldman
Affiliates were deemed to own approximately 75.4% of CFGI under Rules
13d(3) and 13d(5) of the 1934 Securities and Exchange Act, 17 C.F.R.
240.13d-5(b)(1), and 11 U.S.C. §§ 101(2) and (31).

71.     Upon information and belief, the Goldman Affiliates and Goldman Lenders all

operated for the benefit of one entity, The Goldman Sachs Group, Inc.  Therefore, by virtue of

the Goldman Affiliates' equity holdings in CFGI and Mr. Gross's position on the Board and

Special Committee and resultant access to information and other Board members which other creditors did not have, the Goldman Lenders and The Goldman Sachs Group, Inc. had the ability to influence negotiations with the bank syndicate regarding their debt holdings in the Debtors, to their benefit and to the detriment of the Debtors' other creditors.

72.     As a result of the Secured Credit Facility transaction, on or about May 29, 2009, Defendants, as insiders of the Debtors, received preferential payments under the Secured Credit Facility Agreement and Security Agreement in favor of Defendants, in the amount of approximately $139,126,393.95, plus approximately $6,956,319.70 in cash (the "Goldman Insider Preference Transfers").

73.     The Goldman Insider Preference Transfers were made to or for the benefit of Defendants, all of whom are and at all relevant times were insiders of the Debtors.

74.     The Goldman Insider Preference Transfers were each made by the Debtors within one year prior to the Petition Date.

75.     The Goldman Insider Preference Transfers consist of all distributions made to Defendants as a result of the Secured Credit Facility transaction, or otherwise within one year of the Debtors' chapter 11 cases, that were made on account of an antecedent debt owed by the Debtors to Defendants.

76.     As of the date of the Goldman Insider Preference Transfers, the Debtors were insolvent.

77.     The Goldman Insider Preference Transfers enabled Defendants to receive more than they would receive if (i) the Debtors' chapter 11 cases were cases under chapter 7 of the Bankruptcy Code; (ii) each of the Goldman Insider Preference Transfers had not been made;

and (iii) Defendants received payment of the debt on the Pre-Petition Credit Facilities in accordance with other provisions in the Bankruptcy Code.

78.    The funds distributed to Defendants as payments on the 2006 Credit Facility and Bridge Loan should be avoided pursuant to section 547(b) of the Bankruptcy Code.

### SECOND CAUSE OF ACTION – AVOIDANCE OF PREFERENTIAL TRANSFERS AGAINST THE DEFENDANTS AS NON- STATUTORY INSIDERS (11 U.S.C. § 547)

79.    Plaintiffs restate and reallege the foregoing paragraphs, which are incorporated by reference as if set forth fully herein.

80.    At all relevant times, Defendants were "non-statutory" insiders of the Debtors under 11 U.S.C. § 101(31) because Defendants had a close relationship with the Debtors, and as such the Secured Credit Facility and other transactions were not entered into at arm's length between and among the Debtors and Defendants.

      (a)    The Goldman Affiliates owned at least approximately 19.8% of GMACCH Investor LLC, which held approximately 75% of CFGI.

      (b)    The Goldman Affiliates, as members of GMACCH Investor LLC, had the power to appoint a director to the Board, and in November 2008, appointed Mr. Gross, a managing director of The Goldman Sachs Group, Inc. and/or Goldman, Sachs & Co., to the Board.

      (c)    Mr. Gross also was a member of the Special Committee.

      (d)    Mr. Gross actively and directly participated in the internal corporate activities that led to the Secured Credit Facility as a director of CFGI, and played a role for the Debtors in considering other strategic alternatives to the Secured Credit Facility, despite being employed by The Goldman Sachs Group, Inc. and/or Goldman Sachs & Co., whose affiliates were Lenders, and the attendant conflicts of interest, and thereby was able to influence the Debtors' decision-making to Defendants' advantage.

      (e)    Defendants had access to the Board, which gave them the ability to influence the Debtors' decisions.

      (f)    Because of Mr. Gross's position on the Board and Special Committee, Goldman Sachs had access to information that other creditors did not,

including but not limited to the fact that the Board was considering bankruptcy as early as February 2009.

(g)  In connection with their equity and lending investment in CFGI, Goldman Sachs entities played a variety of roles and were granted multiple agency positions in the Debtors' debt and securities transactions from 2006 through the present.

81.  The funds distributed pursuant to the Secured Credit Facility to Defendants should be avoided and recovered by Plaintiffs pursuant to section 547(b) of the Bankruptcy Code.

## THIRD CAUSE OF ACTION – RECOVERY
## OF AVOIDED TRANSFERS
## (11 U.S.C. § 550)

82.  Plaintiffs restate and reallege the foregoing paragraphs, which are incorporated by reference as if set forth fully herein.

83.  To the extent the Goldman Insider Preference Transfers are avoided, all payments made or transferred in respect of the Goldman Insider Preference Transfers should be recovered from the Goldman Lenders, from any entity for whose benefit the Goldman Insider Preference Transfers were made, and/or from any immediate or mediate transferee of the Goldman Lenders, for the benefit of Plaintiffs pursuant to section 550 of the Bankruptcy Code, and Defendants should be ordered to disgorge such amounts recovered.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs pray for relief as follows:

84.     An award in favor of Plaintiffs against the Defendants, including:

    (a)     avoidance and recovery of the Goldman Insider Preference Transfers; and

    (b)     such other and further relief as the Court may deem just and appropriate,
including the fees, costs, interest and expenses of this action.

## JURY TRIAL DEMANDED

85.     Pursuant to Federal Rule of Civil Procedure 38(b), Plaintiffs hereby demand a
trial by jury on all issues triable by jury.

Dated: October 24, 2011
New York, New York

By: _____

Michael C. Harwood (mharwood@kasowitz.com)
Adam L. Shiff (ashiff@kasowitz.com)
Jeffrey R. Gleit (jgleit@kasowitz.com)
Michele L. Angell (mangell@kasowitz.com)
KASOWITZ, BENSON, TORRES
  & FRIEDMAN LLP
1633 Broadway
New York, New York 10019
(212) 506-1700

*Counsel for Capmark Financial Group Inc. et al.,*
*Plaintiffs*