Michael C. Harwood (mharwood@kasowitz.com)
Adam L. Shiff (ashiff@kasowitz.com)
Jeffrey R. Gleit (jgleit@kasowitz.com)
Michele L. Angell (mangell@kasowitz.com)
KASOWITZ, BENSON, TORRES
  & FRIEDMAN LLP
1633 Broadway
New York, New York 10019
(212) 506-1700

*Counsel for Plaintiffs*

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

|  |  |
|---|---|
| CAPMARK FINANCIAL GROUP INC., *et al.*, <br><br>                 Plaintiffs, <br><br>    -against- <br><br> GOLDMAN SACHS CREDIT <br> PARTNERS L.P., *et al.*, <br><br>                 Defendants. | **Civil Action No.** <br> **1:11-cv-07511-RWS** <br><br><br><br> **Jury Trial Demanded** |

**PLAINTIFFS' MEMORANDUM OF LAW IN OPPOSITION TO THE**
**GOLDMAN LENDERS' MOTION TO DISMISS THE AMENDED COMPLAINT**

# TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES ..................................................................................................ii

PRELIMINARY STATEMENT ............................................................................................ 1

BACKGROUND ................................................................................................................... 2

A.    The 2006 Transactions ............................................................................................ 2

B.    The 2007 and 2008 Transactions .......................................................................... 4

C.    The 2009 Secured Credit Facility .......................................................................... 5

D.    Procedural Background............................................................................................ 7

ARGUMENT ........................................................................................................................ 7

A.    Plaintiffs Have Adequately Pleaded that Defendants were Statutory Insiders of Capmark ................................................................................................................... 8

    1.    The Goldman Investors Were Statutory Insiders of Capmark............................... 8

        a.    Members of a Debtor's LLC Affiliate Are Statutory Insiders. ................... 8

        b.    The GMACCH Members Acquired the Capmark Stock Collectively ................................................................................................ 10

    2.    The Controlled Goldman Affiliates' Statutory Insider Status Is Imputed to Defendants ........................................................................................................... 10

        a.    Plaintiffs Are Not Required to Allege Veil Piercing or Alter Ego .......... 11

        b.    The Amended Complaint Sufficiently Alleges that the Goldman Investors' Statutory Insider Status is Attributable to Defendants............ 13

B.    Plaintiffs Have Adequately Pleaded that the Defendants were Non-Statutory Insiders ................................................................................................................... 18

    1.    Insider Status Should Not be Determined on a Motion to Dismiss ...................... 19

    2.    The Goldman Lenders Had a Close Relationship with the Debtors and with Statutory Insiders of the Debtors and Did Not Deal with the Debtors at Arm's Length ...................................................................................................... 20

C.    Neither Judicial Nor Collateral Estoppel Applies to Bar Plaintiffs' Claims .................... 24

CONCLUSION.................................................................................................................... 26

i

## TABLE OF AUTHORITIES

**Page**

CASES

*ACA Fin. Guar. Corp. v. Goldman, Sachs & Co.*,
  35 Misc.3d 1217 (N.Y. Sup. Ct. 2012) ...................................................................16

*Adelphia Recovery Trust v. HSBC Bank USA (In re Adelphia Recovery Trust)*,
  634 F.3d 678 (2d Cir. 2011)...................................................................................24

*Allentown Ambassadors, Inc. v. Northeast Am. Baseball, LLC (In re Allentown
  Ambassadors, Inc.)*,
  361 B.R. 422 (Bankr. E.D. Pa. 2007) ................................................................9, 10

*Anstine v. Carl Zeiss Meditec AG (In re U.S. Medical, Inc.)*,
  531 F.3d 1272 (10th Cir. 2008) .........................................................................20, 22

*Ball v. A.O. Smith Corp.*,
  451 F.3d 66 (2d Cir. 2006)......................................................................................24

*Bartle v. Finkelstein*,
  19 A.D.2d 256 (4th Dep't 1963) ..............................................................................15

*Bianco v. Erkins (In re Gaston & Snow)*,
  243 F.3d 599 (2d Cir. 2001)....................................................................................13

*Butner v. United States*,
  440 U.S. 48 (1971)...................................................................................................14

*Clear Thinking Group LLC v. Brightstar US, Inc. (In re KCMVNO, Inc.)*,
  2010 Bankr. LEXIS 3669 (Bankr. D. Del. Oct. 15, 2010).........................11, 16, 22

*D. Klein & Son, Inc. v. Good Decision, Inc.*,
  2005 U.S. App. LEXIS 2764 (2d Cir. Feb. 15, 2005) .............................................14

*DiFolco v. MSNBC Cable L.L.C.*,
  622 F.3d 104 (2d Cir. 2010)....................................................................................25

*Dolco Invs., Ltd. v. Moonriver Dev., Ltd.*,
  486 F. Supp. 2d 261 (S.D.N.Y. 2007).....................................................................14

*Dover Ltd. v. A.B. Watley, Inc.*,
  2006 U.S. Dist. LEXIS 81391 (S.D.N.Y. Nov. 8, 2006)..........................................15

*EED Holdings v. Palmer Johnson Acquisition Corp.*,
  387 F. Supp. 2d 265 (S.D.N.Y. 2004)......................................................................13

*First Keystone Consultants, Inc. v. Schlesinger Elec. Contrs.*,
    2012 U.S. Dist. LEXIS 67872 (E.D.N.Y. May 15, 2012) .....................................14

*Fletcher v. Atex, Inc.*,
    68 F.3d 1451 (2d Cir. 1995)..........................................................................13

*Floyd v. Hefner*,
    556 F. Supp. 2d 617 (S.D. Tex. 2008) .....................................19, 20, 21

*Gabay v. Mostazafan Found. of Iran*,
    151 F.R.D. 250 (S.D.N.Y. 1993) .............................................................15, 16

*Gary Friedrich Enters., LLC v. Marvel Enters., Inc.*,
    2011 U.S. Dist. LEXIS 30685 (S.D.N.Y. Mar. 22, 2011) .....................14

*Hirsch v. Va. Tarricone (In re A. Tarricone, Inc.)*,
    286 B.R. 256 (Bankr. S.D.N.Y. 2002).....................................19, 20, 21

*In re Chas. P. Young Co.*,
    145 B.R. 131 (Bankr. S.D.N.Y. 1992) ...................................................19

*In re El Paso Corp. S'holder Litig.*,
    2012 Del. Ch. LEXIS 46 (Del. Ch. Feb. 29, 2012)................................16

*In re Foothills Texas, Inc.*,
    408 B.R. 573 (Bankr. D. Del. 2009) ......................................................20

*In re Krehl*,
    86 F.3d 737 (7th Cir. 1996) ...................................................................22

*In re NMI Sys., Inc.*,
    179 B.R. 357 (Bankr. D. D.C. 1995) .....................................................10

*In re Northern Outer Banks Assocs., LLC*,
    2010 Bankr. LEXIS 3974 (Bankr. E.D.N.C. Nov. 8, 2010) ...................9

*In re Piece Goods Shops Co., L.P.*,
    188 B.R. 778 (Bankr. M.D. N.C. 1995)..................................................10

*In re Standard Stores, Inc.*,
    124 B.R. 318 (Bankr. C.D. Cal. 1991).....................................................21

*In re Young Broad., Inc.*,
    430 B.R. 99 (Bankr. S.D.N.Y. 2010) ......................................................10

*Jiaxing Globallion Imp. & Exp. Co. v. Argington, Inc.*,
    2012 U.S. Dist. LEXIS 48491 (E.D.N.Y. Apr. 2, 2012) .......................15

*Key Items, Inc. v. Ultima Diamonds, Inc.*,
  09 Civ. 3729 (HBP), 2011 U.S. Dist. LEXIS 111524 (S.D.N.Y. Sept. 29, 2011)..................13

*Longview Aluminum, L.L.C. v. Brandt*,
  431 B.R. 193 (N.D. Ill. 2010), *aff'd*, *In re Longview Aluminum*, 657 F.3d 507
  (7th Cir. 2011).........................................................................................................................9

*Maung Ng We v. Merrill Lynch & Co.*,
  2000 U.S. Dist. LEXIS 11660 (S.D.N.Y. Aug. 14, 2000) ......................................................18

*Morales v. New Valley Corp.*,
  999 F. Supp. 470 (S.D.N.Y. 1998) ........................................................................................10

*O'Connel v. Shallo (In re Die Fliedermaus LLC)*,
  323 B.R. 101 (Bankr. S.D.N.Y. 2005)....................................................................................9

*Office of U.S. Tr. v. Fieldstone Mortgage Co.*,
  2008 U.S. Dist. LEXIS 91479 (D. Md. Nov. 5, 2008) ..........................................................10

*Official Comm. of Unsecured Creditors of Buckhead Am. Corp. v. Reliance Capital
  Group (In re Buckhead Am. Corp.)*,
  178 B.R. 956 (D. Del. 1994)..................................................................................................15

*Official Comm. of Unsecured Creditors of Champion Enters. v. Credit Suisse
  (In re Champion Enters.)*,
  2010 Bankr. LEXIS 2720 (Bankr. D. Del. Sept. 1, 2010) .................................................11, 22

*Official Comm. of Unsecured Creditors v. Credit Suisse First Boston
  (In re Exide Techs., Inc.)*,
  299 B.R. 732 (Bankr. D. Del. 2003) ....................................................................................22, 23

*Official Unsecured Creditors' Comm. of Broadstripe, LLC v. Highland Capital Mgmt.,
  L.P. (In re Broadstripe, LLC)*,
  444 B.R. 51 (Bankr. D. Del. 2010) ........................................................................................19

*OHC Liquidation Trust v. Credit Suisse First Boston (In re Oakwood Homes Corp.)*,
  340 B.R. 510 (Bankr. D. Del. 2006) ......................................................................................19

*Richman v. Goldman Sachs Group, Inc.*,
  2012 U.S. Dist. LEXIS 86556 (S.D.N.Y. June 21, 2012)......................................................16

*Roth v. Jennings*,
  489 F.3d 499 (2d Cir. 2007)...................................................................................................10

*Shubert v. Lucent Techs., Inc. (In re Winstar Commc'ns, Inc.)*,
  554 F.3d 382 (3d Cir. 2009)...................................................................................................20

*Solomon v. Barman (In re Barman)*,
 237 B.R. 342 (Bankr. E.D. Mich. 1999) ...................................................................9

*Southern New Eng. Tel. Co. v. Global NAPs Inc.*,
 624 F.3d 123 (2d Cir. 2010) ...................................................................................14

*Statek Corp. v. Dev. Specialists, Inc. (In re Coudert Bros. LLP)*,
 673 F.3d 180 (2d Cir. 2012) ...................................................................................13

*Stern v. Marshall*,
 131 S. Ct. 2594 (2011) ...........................................................................................13

*Sykes v. Mel Harris & Assocs., LLC*,
 757 F. Supp. 2d 413 (S.D.N.Y. 2010) ....................................................................17

*Sysco Food Serv. of Metro N.Y., LLC v. Jekyll & Hyde, Inc.*,
 2009 U.S. Dist. LEXIS 108317 (S.D.N.Y. Nov. 17, 2009) .....................................18

*Tomsic v. Sales Consultants of Boston, Inc. (In re Salience Assocs.)*,
 371 B.R. 578 (Bankr. D. Mass. 2007) ....................................................................20

*United States v. Tenzer*,
 213 F.3d 34 (2d Cir. 2000)......................................................................................25

*United States v. Thorn*,
 446 F.3d 378 (2d Cir. 2006).....................................................................................25

*United States v. Bestfoods*,
 524 U.S. 51 (1998)..................................................................................................14

*Wm. Passalacqua Builders v. Resnick Developers S.*,
 933 F.2d 131 (2d Cir. 1991)....................................................................................14

## STATUTES

11 U.S.C. § 101.................................................................................................. *passim*

11 U.S.C. § 547..............................................................................................7, 11, 13, 21

11 U.S.C. § 550....................................................................................................13

## RULES

Fed. R. Civ. P. 8(a) .............................................................................................13

## OTHER AUTHORITIES

17 C.F.R. § 240.13d-3.........................................................................................10

17 C.F.R. § 240.13d-5 ............................................................................................... 10

H.R. Rep. No. 95-595, 1st Sess. (1977), *reprinted in* 1978 U.S.C.C.A.N. 5963 ........................... 20

## PRELIMINARY STATEMENT

There is no dispute on this motion – nor will there be at trial – that Defendants received a $145 million payment and upgraded their creditor status from unsecured to secured, less than 5 months before Capmark entered bankruptcy in 2009, allowing them preferential treatment over other creditors that did not have any inside affiliation. The only thing slowing Plaintiffs' right to recover this preferential payment, so that all similarly situated creditors may receive comparable treatment, is Defendants' dispute over whether their inside role with the Debtors rendered this payment recoverable under the Bankruptcy Code. On the facts in the Amended Complaint, the coordinated conduct of Defendants and their affiliates in the 2006 leveraged buyout and their involvement not only in the Debtors' management but in the events leading to the $145 million preferential payment and the timing of Debtors' decision to enter bankruptcy rendered them insiders under the Bankruptcy Code and obligates them to return the funds.

In order to evade their insider status, Defendants set an inapplicably high legal standard that they argue Plaintiffs cannot satisfy. It is not disputed, however, that Defendants and their jointly-controlled investment funds participated in the 2006 leveraged buyout of Capmark's predecessor through which they – together – made a loan to and became a part owner of Capmark with a seat on Capmark's Board of Directors. Through the rights under the interlinked credit and acquisition agreements, the Goldman lender and investor entities became insiders of Capmark. As members of a limited liability company that owned approximately 74% of Capmark, the Goldman investors were statutory insiders of the Debtors under the Bankruptcy Code and case law, rendering this preferential payment automatically recoverable.

According to Defendants, which are jointly owned, dominated, and controlled with the investor entities by their parent Goldman Sachs, Plaintiffs must pierce the corporate veil under state law for them to be treated as statutory insiders. Defendants are wrong. Goldman cannot dodge preference liability by simply changing hats back and forth so that they appear to be investors for some purposes and lenders for others. The Goldman lenders and investors, and the parent entity, acted as a single unit to manage the funds they had tied up in Capmark and used

that influence to ensure that they were paid first and with finality.  The Amended Complaint sets forth more than sufficient, and plausible, allegations that the Goldman units that made the loans and the investments were sufficiently united to be statutory insiders.  At this early stage, that is all that is required.

The Amended Complaint further alleges in significant detail Defendants' multi-faceted relationship with Capmark, spanning several years, during which time these Goldman entities and their affiliates made intertwined equity investments in and loans to Capmark, obtained highly compensated agency and advisory positions to Capmark on a non-arm's length basis, and were represented by a Goldman Managing Director who sat on Capmark's Board of Directors and Finance Committee.  When Capmark decided to restructure the leveraged buyout debt, Goldman's Capmark Board member actively participated in restructuring discussions in the conflicting, simultaneous roles as both a director of, and lender to, Capmark.  These roles render Defendants non-statutory insiders for purposes of the preference statute, again allowing Plaintiffs to recover the $145 million preferential payment.

Defendants' additional argument that this action is barred by estoppel can be disposed of summarily, inasmuch as this Court has already rejected the estoppel argument on the motion to change venue.  Defendants know full well that the Delaware Bankruptcy Court never considered, much less resolved, Goldman's insider status or its role in the preferential transfer.  Judge Sontchi initially and erroneously deemed the claims to be moot as part of a settlement but corrected himself to note that they were carved out of the settlement and remained for resolution another time.  That time has come, and the Amended Complaint adequately states a claim.

## BACKGROUND

### A.      The 2006 Transactions

On March 23, 2006, several wholly owned and controlled affiliates of The Goldman Sachs Group, Inc. ("The Goldman Sachs Group," together with its affiliates, "Goldman") entered into a package of intertwined agreements whereby Goldman and a group of other investors completed a leveraged buyout (the "LBO Transaction") of what became Plaintiff Capmark Financial Group

Inc. ("Capmark").  Am. Compl. ¶¶ 2, 29-36.  Goldman's four wholly-owned investment funds ("Goldman Investors")[1] became members of GMACCH Investor LLC ("GMACCH"), which acquired approximately 74% controlling ownership stake in Capmark.  Id. ¶¶ 2, 29.  The Goldman Investors held a 19.8% ownership interest in GMACCH and, as such, became a majority owner of Capmark together with its fellow LLC members in the deal.  Id. ¶¶ 2, 29-30.

As an integral part of the LBO Transaction, Defendants ("Defendants" or the "Goldman Lenders") participated in two loans to Capmark to finance the LBO Transaction:  (i) a $5.5 billion Unsecured Credit Facility dated March 23, 2006 (the "2006 Credit Facility"), with Defendant Goldman Sachs Credit Partners L.P. as the Documentation Agent; and (ii) a $5.25 billion Unsecured Bridge Loan dated March 23, 2006 (the "Bridge Loan"), with Defendant Goldman Sachs Credit Partners L.P. again acting  as a Documentation Agent, Joint Lead Arranger, and Joint Bookrunner.  Id. ¶ 31.

The debt and equity aspects of Goldman's investment in Capmark were inextricably intertwined – neither the loans nor the acquisition would occur without the other.  Id. ¶ 33.  The Pre-Petition Credit Facilities were subject to conditions precedent requiring that GMACCH, including the Goldman Investors, close on the acquisition.  Id.  Likewise, the acquisition by GMACCH was conditioned on the execution of the Pre-Petition Credit Facilities by Defendants pursuant to a commitment letter issued by, among others, Defendant Goldman Sachs Credit Partners L.P.  Id.  At the same March 23, 2006 closing, Capmark entered into an agreement to retain Goldman Sachs & Co. to provide management, monitoring, and advisory services to Capmark for a fee of approximately $4 million per year, to increase by 5% annually, regardless of whether any services were provided.  Id. ¶ 35.

Also pursuant to the interrelated LBO Transaction, the Goldman Investors, as members of GMACCH, obtained the right to appoint a representative to Capmark's Board of Directors to represent Goldman's interests.  Id. ¶¶ 2, 34.  Goldman selected three of its Managing Directors to

---

[1]  GS Capital Partners V Fund, L.P; GS Capital Partners V Offshore Fund, L.P.; GS Capital Partners V GmbH & Co. KG; and GS Capital Partners V Institutional, L.P.

serve *in seriatim* on the Capmark Board from 2006 through 2009. *Id.* ¶ 38.[2]  Throughout their

respective tenures on the Board, each of these Goldman Managing Directors acted as the agent

and representative of Defendants and The Goldman Sachs Group, as well as of the Goldman

Investors.  Each one also became a member of the Capmark Board's Risk, Controls and Finance

Committee ("Finance Committee").  *Id.* ¶¶ 2, 38.

Thus, The Goldman Sachs Group required that they and their wholly-owned and

controlled investor and lender entities simultaneously enter into the interrelated and inextricably

intertwined acquisition agreements, loan agreements, management agreement, and stockholders

agreement such that The Goldman Sachs Group's controlled affiliates would have a controlling

interest in, be among the lead lenders to, be managers and advisors to, and have a representative

on the Board of Capmark.  *Id.* ¶¶ 29, 31, 34-36.  Capmark and the new owners and lenders who

participated in the LBO Transaction intended, understood, and represented to the investing

public that all parts of the LBO Transaction were and should be viewed as one unified

transaction, as detailed in the Amended Complaint.  *Id.* ¶ 37.  By virtue of this LBO Transaction,

Defendants and their affiliated parent and Goldman Investors acted jointly to become lenders,

owners, and managers of Capmark.  *Id.* ¶ 36.

**B.**     **The 2007 and 2008 Transactions**

Over the next two years, Capmark refinanced some of the LBO debt in a manner that

benefited Goldman in its roles as lender (by receiving early repayment of some debt) and

investor (by reducing some of the debt burden of the company it now owned).  *Id.* ¶ 39.  In May

2007, Capmark issued $2.55 billion of senior unsecured notes in a private placement.  *Id.*

Goldman, Sachs & Co., which was over 98% owned by The Goldman Sachs Group, served as

the Global Coordinator and Bookrunner of the Note offering, for which it received substantial

compensation.  Nearly all the proceeds from the Note issuance were used to repay a portion of

the Bridge Loan that was owed to Defendants.  *Id.*  Goldman's (and therefore Defendants')

---

[2]  Stephen Trevor served from March through September 2006, Stuart Katz served from October 2006 through
November 2008, and Bradley Gross served from November 2008 until the bankruptcy in October 2009.

Board representative voted to approve this transaction.  *Id.* ¶ 41.  In May 2008, Capmark engaged in an exchange offer to exchange the $2.55 billion of privately offered 2007 Notes for publicly tradable notes.  *Id.* ¶ 40.  Not surprisingly, Goldman, Sachs & Co. was chosen as the underwriter of the 2008 exchange offer, for which it again received substantial compensation.  *Id.*  However, the Board noted that Goldman Sachs & Co.'s role as lead underwriter made it necessary for Capmark to file an SEC Form S-1 shelf registration disclosing "Goldman Sachs' affiliation with the Company by virtue of its ownership interest and Board representation."  *Id.* ¶ 42.  Capmark did not distinguish in this SEC filing among the various Goldman entities serving as an owner, a Board member, a lender, and an underwriter when it disclosed "Goldman Sachs' affiliation."  *Id.*  Again, Goldman's (and therefore Defendants') Board representative voted to approve this transaction.  *Id.* ¶ 41.

In November 2008, Bradley Gross became Goldman's Board representative.  Mr. Gross was a Managing Director of The Goldman Sachs Group, served on the Capmark Board's Finance Committee, and acted as the agent and representative of Defendants, the Goldman Investors, and The Goldman Sachs Group.  *Id.* ¶ 38.  Despite the potentially conflicting interests of the various Goldman units, Mr. Gross remained in regular communication regarding Capmark with Goldman employees involved in both its lending and investment business.  *Id.* ¶ 52.

**C.**      **The 2009 Secured Credit Facility**

In late 2008, the Debtors found themselves in a challenging financial situation, expecting to incur a substantial loss in the fourth quarter (ultimately exceeding $1 billion).  *Id.* ¶¶ 4, 53.  Accordingly, the Debtors explored alternatives aimed at extending the maturity of their debt and potentially converting debt to equity to stabilize their balance sheet for the long term.  *Id.*  The Debtors' most pressing financial challenge was the impending March 23, 2009 due date for the principal balance on the Bridge Loan owed to Defendants, among others.  *Id.*

To deal with these financial difficulties, Capmark's Board appointed a special committee to consider strategic restructuring alternatives ("Special Committee").  *Id.* ¶ 54.  Mr. Gross

served on the Special Committee despite the fact that his employer The Goldman Sachs Group controlled the Defendant Goldman Lenders as well as the Goldman Investors with a controlling interest in Capmark. *Id.* As a result, The Goldman Sachs Group and Goldman Sachs & Co., through their employees, including Mr. Gross and others identified in the Amended Complaint, had representatives on both sides of the proposed restructuring. *Id.*

Mr. Gross participated, along with other Goldman employees (including those with both lending and investment roles), in numerous Special Committee and Board meetings and communications regarding how to deal with the impending Bridge Loan. *Id.* ¶¶ 52, 54-63. The result was that Capmark agreed with the parties to the 2006 Credit Facility and Bridge Loan, including Defendants, to enter into a new $1.5 billion secured loan ("Secured Credit Facility") on May 29, 2009, which Capmark used to pay down the same amount of the 2006 unsecured loans. *Id.* ¶ 44. Managing Directors of The Goldman Sachs Group executed the Secured Credit Facility agreement on behalf of Defendants. *Id.* ¶ 76. Pursuant to the Secured Credit Facility, Capmark granted security interests in nearly all its U.S. and Canadian mortgage loan assets and foreclosed real estate (other than its ownership of and the assets of Capmark Bank). *Id.* ¶¶ 45-46. Capmark's Board approved this transaction; although Mr. Gross of Goldman participated in Board discussions of this loan, he ultimately abstained from the vote on the resolution as a fig leaf to protect Goldman's conflicted positions. *Id.* ¶¶ 4, 52, 60.

Capmark used the $1.5 billion proceeds from the Secured Credit Facility, plus $75 million in cash, to repay most of the Bridge Loan and a portion of the 2006 Credit Facility, as required under the Secured Credit Facility. *Id.* ¶ 47. The Secured Credit Facility thus replaced unsecured debt with Secured Debt, which was better positioned to be paid in full when the Debtors entered bankruptcy just five months later. *Id.* ¶ 48. The Secured Credit Facility had repayment terms that were less favorable to Capmark than the 2006 Credit Facility and Bridge Loan, including a higher "Base Rate" interest rate, an additional "Applicable Margin" of 1.5% per year above the "Base Rate," and an additional "Applicable Margin" of 2.5% per year for "Eurodollar Rate Advances," as well as imposing liens on most of its non-Capmark Bank

properties.  *Id*. ¶¶ 46, 51.

Defendants, as Lenders on the 2006 Credit Facility and Bridge Loan, received

$145,623,054 from Capmark's Secured Credit Facility and cash payment, as further detailed in

the Amended Complaint.  *Id*. ¶¶ 91-93.  Less than 90 days later, Capmark's Board considered

filing for bankruptcy within the 90 day preference period that would have required Defendants to

return these payments regardless of whether they were insiders, but the Board, including Mr.

Gross, decided to wait until after the preference period expired.  *Id*. ¶¶ 7, 67.  Capmark filed its

Chapter 11 petition less than two months after this preference period expired.  *Id*. ¶¶ 7, 68.

D.     **Procedural Background**

Each of the Debtors commenced bankruptcy proceedings on or after October 25, 2009.

On August 24, 2011, the Delaware Bankruptcy Court confirmed the Debtors' Plan of

Reorganization.  Under the Plan, Plaintiffs retained the right to prosecute these insider preference

claims.  The Plan became effective and was substantially consummated on September 30, 2011.

Plaintiffs filed their initial complaint in this action on October 24, 2011.

On November 30, 2011, Defendants moved to transfer this action to the Bankruptcy

Court, which this Court denied on March 5, 2012.  Defendants moved to dismiss the Complaint

on April 20, 2012.  On May 18, 2012, Plaintiffs filed and served the Amended Complaint,

pursuant to a scheduling stipulation.  Defendants withdrew their initial motion to dismiss and

filed this substantially identical motion on June 29, 2012.

## ARGUMENT

Bankruptcy Code § 547 provides that all payments on antecedent debt made within 90

days before bankruptcy are preferences that debtors can recover automatically (subject to certain

defenses not at issue now).  Section 547 extends this recovery period to one year if the payments

are made to a debtor's insiders.  The only question on this motion is whether the Goldman

Lenders that received the preference payments are insiders.  The Amended Complaint adequately

alleges that they were (i) statutory insiders due to their relationship with the Goldman Investors

that had a controlling share in Capmark and (ii) non-statutory insiders in their own right.

**A.    Plaintiffs Have Adequately Pleaded that
Defendants were Statutory Insiders of Capmark**

**1.    The Goldman Investors Were Statutory Insiders of Capmark**

The Goldman Investors were statutory insiders of the Debtors at the time of the Secured Credit Facility because they had acquired their Capmark stock collectively with a group of investors who together became members of GMACCH, a limited liability company that owned approximately 74% of Capmark.  In both capacities, as part of an investor group and as members of GMACCH, they are deemed to be in control of Capmark, similar to directors or general partners of an affiliate of the Debtors.  Courts in this District and elsewhere have interpreted the definition of "insider" in section 101(31) of the Bankruptcy Code, to include such entities.

**a.    Members of a Debtor's LLC Affiliate Are Statutory Insiders**

Section 101(31) of the Bankruptcy Code provides that an "insider" of a corporate debtor "includes" a (i) "director," (ii) "officer," (iii) "person in control," (iv) "general partner" of the debtor, or (v) a relative of one of those (11 U.S.C. § 101(31)(B)), and (vi) an "affiliate, or an insider of an affiliate as if such affiliate were the debtor" (*id*. at § 101(31)(E)).  An "affiliate" is an "entity that directly or indirectly owns, controls, or holds with power to vote, 20 percent of more" of the debtor.  *Id*. at § 101(2)(A).[3]  Thus, GMACCH meets the definition of "affiliate" by virtue of its status as an LLC investment vehicle formed to acquire approximately 74% of Capmark, the parent company Debtor.  Defendants do not dispute this.  The Goldman Investors were LLC members of GMACCH, which makes them insiders of Capmark under the case law because they were insiders of its controlling affiliate GMACCH.

The Bankruptcy Code does not specifically address LLCs, having been enacted in 1978, before the advent of LLCs in the early 1990s.  Nonetheless, courts analyzing statutory insiders commonly analogize members of an LLC to directors of a corporation for these purposes, and consistently hold that LLC members are statutory insiders of an LLC because, as the Seventh

---

[3]  Goldman apparently thought it was protecting itself by holding only 19.8% of GMACCH so as to avoid the 20% threshold, but this effort to be clever does nothing.  Goldman still indirectly controlled 74% of Capmark through its membership in GMACCH, as the case law discussed in the next paragraph makes clear.

Circuit recently agreed, "directors are generally provided with authority for managing the corporation and members are generally provided with authority for managing the limited liability company." *Longview Aluminum, L.L.C. v. Brandt*, 431 B.R. 193, 197 (N.D. Ill. 2010) (in concluding that an LLC member was a statutory "insider" under section 101(31), "court must look beyond mere titles ... and examine the legal rights ... in question."), *aff'd*, *In re Longview Aluminum*, 657 F.3d 507 (7th Cir. 2011).  The Bankruptcy Court for this District has explained:

> Although the Bankruptcy Code was drafted without consideration of entities such as LLCs, the Code's definition of 'insider' is sufficient to cover the ... Defendants, at least for purposes of this motion to dismiss....  Section 101(31) of the Bankruptcy Code is concerned with ... ability to exert influence over a debtor so as to gain a more favorable position....  Contemporary insider analysis invites the Court to consider whether the disputed relationship is similar to or bears characteristics of any of the relationships specified in the statute.  As stated above, the [state LLC law] presumptively puts members in control of the LLC, and as such they are in a position to exert influence over the LLC.  This sufficiently places them within the parameters of the Bankruptcy Code's definition of insider.

*O'Connel v. Shallo (In re Die Fliedermaus LLC)*, 323 B.R. 101, 111 (Bankr. S.D.N.Y. 2005) (citations omitted).  *See In re Northern Outer Banks Assocs., LLC*, 2010 Bankr. LEXIS 3974, at *7 (Bankr. E.D.N.C. Nov. 8, 2010) ("a managing member of a limited liability company can be analogized to a director of a corporation under § 101(31)...."); *Solomon v. Barman (In re Barman)*, 237 B.R. 342, 348 (Bankr. E.D. Mich. 1999) ("a limited liability company ... is sufficiently analogous to a corporation that for purposes of determining insiders, it is appropriate to consider the similar principles").

Therefore, under 11 U.S.C. §§ 101(31)(B), (E), and (2)(A), the Goldman Investors, as members of GMACCH were statutory insiders of GMACCH and statutory insiders of Capmark as insiders of an affiliate of Capmark.  Defendants do not dispute that GMACCH was an affiliate and thus an insider of Capmark nor do they cite any case law holding that a member of an LLC is not an insider of the LLC.[4]  The Goldman Investors were thus statutory insiders of the Debtors.

---

[4]  For statutory insider purposes, LLC members are also analogous to general partners, which are statutory insiders of a corporate debtor under section 101(31)(B).  Much like a general partner manages a partnership, the members of GMACCH, including the Goldman Investors, had management authority over the LLC. The roles of "LLC member" and "general partner" are identical in all relevant senses, and courts have opined that LLCs bear similarities to partnerships in many respects.  *See, e.g., Allentown Ambassadors, Inc. v. Northeast Am. Baseball, LLC (In re Allentown Ambassadors, Inc.)*, 361 B.R. 422, 442 (Bankr. E.D. Pa. 2007) ("An LLC is a conceptual hybrid, sharing

### b.   The GMACCH Members Acquired the Capmark Stock Collectively

Furthermore, under Rules 13d(3) and 13d(5) of the 1934 Securities and Exchange Act, if persons agree to act together for the purpose of purchasing an issuer's shares, each person "'shall be deemed' to be the beneficial owner 'of all equity securities of that issuer beneficially owned by any' member of the group." *Roth v. Jennings*, 489 F.3d 499, 508 (2d Cir. 2007) (quoting 17 C.F.R. § 240.13d-5(b)(1)).  The Goldman Investors and their co-investors formed GMACCH specifically to acquire Capmark stock as a group.  As such, the Goldman Investors are deemed to own collectively the 74% of Capmark that GMACCH owned.  Again, this renders the Goldman Investors to be affiliates and statutory insiders of the Debtors under 11 U.S.C. § 101(31)(E).[5]

### 2.   The Controlled Goldman Affiliates' Statutory Insider Status Is Imputed to Defendants

Having established that the Goldman Investors were insiders, Plaintiffs recognize that this Court needs to take one more step:  inasmuch as the Bankruptcy Code permits recovery of preferential payments from the recipients only, the Defendant Goldman Lenders here, the insider status needs to cover them as well.  Defendants argue that Plaintiffs must pierce the corporate veils among Goldman, the Goldman Investors, and the Goldman Lenders under New York law in order to recover the payments.  Defendants are wrong, as their own case law demonstrates.  Their theory would effectively destroy preference liability whenever an investor uses a separate lending entity to make and receive loan payments.  Goldman insiders could merely direct that a company borrow from and repay a wholly-controlled Goldman affiliate for the express purpose of precluding an insider preference claim.  Indeed, this is precisely what occurred here.  Contrary

---

some of the characteristics of partnerships and some of corporations.  In particular, an LLC combines the two most critical features of all of the other business organizations in a single business organization -- a corporate-styled liability shield and the pass-through tax benefits of a partnership.") (citations omitted).

[5]  Courts have recognized Rule 13d in the bankruptcy context.  *See Morales v. New Valley Corp.*, 999 F. Supp. 470, 475 (S.D.N.Y. 1998) (where preferred shareholders came together and formed agreement to maximize value received under bankruptcy plan of reorganization, they were a group under Rule 13d); *In re Young Broad., Inc.*, 430 B.R. 99, 113-14 (Bankr. S.D.N.Y. 2010) (investment advisor that administers funds has formed a group under Rule 13d).  Bankruptcy court decisions, including insider preference decisions, have employed other securities law provisions to interpret the Bankruptcy Code.  *See Office of U.S. Tr. v. Fieldstone Mortgage Co.*, 2008 U.S. Dist. LEXIS 91479, at *14 n.14 (D. Md. Nov. 5, 2008) (court looked to securities law for meaning of "officer"); *In re NMI Sys., Inc.*, 179 B.R. 357, 368-69 (Bankr. D. D.C. 1995) (same); *see also In re Piece Goods Shops Co., L.P.*, 188 B.R. 778, 797 (Bankr. M.D. N.C. 1995) (citing 17 C.F.R. § 230.405).

to Defendants' analysis, the law requires Plaintiffs to allege only that facts and circumstances justify imputing the insider status to the entities that received the preference payments in order to prevent inequity.  The Amended Complaint adequately alleges such inequitable circumstances.

Even assuming *arguendo* that the additional factors relevant to veil piercing were required here, the allegations in the Amended Complaint are sufficient to allow the Court to infer that Defendants, the Goldman Investors, and The Goldman Sachs Group acted as alter egos of one another in connection with the Capmark relationship.  Plaintiffs have pleaded more than enough about the Goldman operations at this pre-discovery stage.

### a.    Plaintiffs Are Not Required to Allege Veil Piercing or Alter Ego

Defendants' entire basis for asserting that Plaintiffs must allege veil piercing or alter ego theories to recover these preferential transfers rests on *one case* that considered a preference claim under section 547 (Def. Br. at 7) – but they fail to quote that court's language, which is directly contrary to their theory.  In *Clear Thinking Group LLC v. Brightstar US, Inc. (In re KCMVNO, Inc.)*, 2010 Bankr. LEXIS 3669 (Bankr. D. Del. Oct. 15, 2010), the plaintiff sought to recover a preference from an affiliate of an insider parent company.  The court dismissed the insider preference count (without prejudice) because there were "no veil-piercing, agency, *or other allegations* to support imputing [parent's] actions to [the transferee].  The alleged facts do not allow the Court to *draw an inference* that [transferee] is an insider of [debtor]."  *Id*. at *2, *14 (emphasis added).  That court would have accepted allegations of any conduct, including but not limited to veil piercing or agency principles, that justified imputing the insider's conduct to the transferee for preference purposes, but the complaint had no such allegations at all.  *Id*.[6]

Here, Goldman had a three-year, multi-faceted relationship with Capmark, through various subsidiaries, beginning with the simultaneous investment in and loans to Capmark by

---

[6]  Defendants also cite *Official Comm. of Unsecured Creditors of Champion Enters. v. Credit Suisse (In re Champion Enters.)*, 2010 Bankr. LEXIS 2720, at *27-30, *64 (Bankr. D. Del. Sept. 1, 2010), but that case required veil piercing allegations for claims for fraudulent and misleading prospectuses and violation of disclosure duties, not preference liability.  The court declined to impute false statements to a non-speaker for purposes of equitably subordinating that party's claims.  It is inapplicable here.

Goldman entities selected by the parent company to participate in the integrated LBO Transaction that gave the members of GMACCH ownership control of Capmark.  Am. Compl. ¶¶ 29, 31, 36.  In order to protect the funds it invested and lent in the LBO Transaction, a Goldman Managing Director joined Capmark's Board of Directors and the Board's Finance Committee, and later joined the Board's Special Committee to restructure these very loans.  *Id*. ¶¶ 34, 38.  Over the three years before the bankruptcy, the Capmark Board, with the Goldman member present, selected Goldman entities to serve in several highly compensated agency and advisory positions.  *Id*. ¶¶ 3, 6, 35, 58.  During the Secured Credit Facility negotiations in 2009 that led to the preference payments, Goldman's Board representative, Mr. Gross, and several of his Goldman colleagues, participated in meetings and had access to confidential Board materials and critical information that other creditors did not.  *Id*. ¶¶ 52, 54-66.

Mr. Gross and his Goldman colleagues used this information to their advantage, including to get their own Goldman-friendly restructuring proposals before the Board and to solicit additional compensated positions with Capmark.  *Id*. ¶¶ 57-60.  Rather than recuse himself from all discussions about the Secured Credit Facility, and despite acknowledging the conflicts of interest among his roles for Capmark, Goldman, the Goldman Investors, and the Goldman Lenders, Mr. Gross participated in the restructuring discussions and influenced the Debtors' decision-making to Defendants' and Goldman's advantage, and to other creditors' detriments. *Id*.  Indeed, Mr. Gross was invited to meetings specifically because of his role on behalf of the Defendant Goldman Lenders.  *Id*. ¶ 57.  He was involved in Board discussions of no less than *thirteen* major decisions that affected the Debtors' strategic alternatives to the Secured Credit Facility – half of which he voted for.  *Id*. ¶ 60.  When the time came for the Capmark Board to decide whether to approve the Secured Credit Facility, Mr. Gross participated in every aspect of that meeting but recused himself from that one vote due to his sudden concern about a conflict. Yet, if he were truly acting solely as a Board member and Goldman Investor representative, with no role for the Goldman Lenders, there would not have been a conflict.  Further, just prior to the expiration of the 90-day statutory non-insider preference period after these challenged payments,

Capmark's Board, *including Mr. Gross*, calculated the timing of the bankruptcy filing and decided to wait until after the 90 days passed – an unusual action for an insolvent company's directors that can only be described as lender-friendly. *Id*. ¶¶ 67-68.

Goldman made no distinction between its roles as an investor in and lender to Capmark, nor should the Court on this motion. The Amended Complaint sets forth plausible allegations that Defendants and the Goldman Investors acted in a manner that was sufficiently united in interest to impute the Goldman Investors' statutory insider status to Defendants.

> **b.    The Amended Complaint Sufficiently Alleges that the Goldman Investors' Statutory Insider Status is Attributable to Defendants**

If the Court nonetheless determines that Plaintiffs need to meet a standard of veil piercing, alter ego, and/or agency, the Amended Complaint sufficiently does so. But Defendants assert an inapplicably high factual standard for such claims. This Court has explained that "[i]n this district, veil-piercing claims are subject to the pleading requirements imposed by Fed. R. Civ. P. 8(a), which requires only a short and plain statement of the claim." *EED Holdings v. Palmer Johnson Acquisition Corp.*, 387 F. Supp. 2d 265, 274 (S.D.N.Y. 2004) (Sweet, J.). *See also Key Items, Inc. v. Ultima Diamonds, Inc.*, 09 Civ. 3729 (HBP), 2011 U.S. Dist. LEXIS 111524, at *23 (S.D.N.Y. Sept. 29, 2011) ("veil-piercing claims are generally subject to Rule 8(a), unless the allegations pertain to fraud") (collecting cases). Preference claims by their very nature do not involve fraud and, accordingly, Plaintiffs are subject only to Rule 8(a).

Defendants incorrectly assert that New York or Delaware state alter ego law applies. Because this case is here solely on federal questions under Bankruptcy Code sections 547 and 550, and not diversity jurisdiction, the federal alter ego standard is employed.[7] The Second

---

[7] In this preference action, Plaintiffs are "asserting a right of recovery created by federal bankruptcy law." *Stern v. Marshall*, 131 S. Ct. 2594, 2618 (2011). In addition to federal bankruptcy jurisdiction, this Court has federal question subject matter jurisdiction. Since Plaintiffs are not asserting any state law claims, the Court does not need to perform an alter ego choice of law analysis. But Defendants wrongly rely on *Fletcher v. Atex, Inc.*, 68 F.3d 1451 (2d Cir. 1995), a case arising under diversity jurisdiction, for the proposition that New York's choice of law rules apply. "When a district court exercises federal question jurisdiction, federal law provides the substantive rules of decision and there is generally no need to consider choice of law." *Statek Corp. v. Dev. Specialists, Inc. (In re Coudert Bros. LLP)*, 673 F.3d 180, 187 n.7 (2d Cir. 2012). The Second Circuit has also held that only if no federal policy is implicated may state choice of law rules apply to state law issues in a bankruptcy matter. *See Bianco v. Erkins (In re Gaston & Snow)*, 243 F.3d 599, 607 (2d Cir. 2001). This is not a diversity case, nor do any claims arise out of state law. The only counts asserted in the Amended Complaint are under sections Bankruptcy Code 547

Circuit holds that a plaintiff "need only demonstrate that it would be unfair under the circumstances not to disregard the corporate form. The rule in federal cases is founded only on the broad principle that a corporate entity may be disregarded in the interests of public convenience, fairness and equity." *Southern New Eng. Tel. Co. v. Global NAPs Inc.*, 624 F.3d 123, 139 (2d Cir. 2010) (citations omitted).[8]  As the Supreme Court held in *Butner v. United States*, 440 U.S. 48, 54 (1971), Congress's adoption of the Bankruptcy Act demonstrated an intent to impose uniform federal laws on the subject of fraudulent transfers and preferences in bankruptcy, thereby precluding reference to state law to determine these property rights. This remains true under the Bankruptcy Code. For this reason, all the veil piercing cases that Defendants discuss on pages 8-13 of their brief imposing higher state law standards are inapposite because they all either arose in diversity jurisdiction or alleged veil piercing claims solely under state law. Defendants fail to discuss any cases applying federal principles.[9]

Even outside of a pure federal question case, "[i]n the Second Circuit, [alter ego status] is determined using a two-pronged test that asks (1) whether the entities in question operated as a single economic entity, and (2) whether there was an overall element of injustice or unfairness." *Gary Friedrich Enters., LLC v. Marvel Enters., Inc.*, 2011 U.S. Dist. LEXIS 30685, at *15-16 (S.D.N.Y. Mar. 22, 2011) (citations omitted). "[V]eil piercing may be used to reach the assets of either the ... owners or the other owner-controlled corporate entities." *D. Klein & Son, Inc. v. Good Decision, Inc.*, 2005 U.S. App. LEXIS 2764, at *6 (2d Cir. Feb. 15, 2005) (citations omitted). *See Wm. Passalacqua Builders v. Resnick Developers S.*, 933 F.2d 131, 140 (2d Cir. 1991) (veil may be pierced to reach owner's assets where group of corporations operated as

---

and 550, and "a separate cause of action to pierce the corporate veil does not exist independent from the claims asserted against the corporation." *First Keystone Consultants, Inc. v. Schlesinger Elec. Contrs.*, 2012 U.S. Dist. LEXIS 67872, at *48 (E.D.N.Y. May 15, 2012).

[8]  This Court has ruled, "[i]n the Second Circuit, federal common law requires that plaintiff allege only domination to state a claim for alter ego liability." *Dolco Invs., Ltd. v. Moonriver Dev., Ltd.*, 486 F. Supp. 2d 261, 271 (S.D.N.Y. 2007) (Sweet, J.). Using the corporate form to commit fraud is not required, as Defendants assert.

[9]  Defendants cite *United States. v. Bestfoods*, 524 U.S. 51 (1998), but the Supreme Court there expressly noted that there was a dispute among courts and commentators as to whether to "borrow state law, or instead apply a federal common law of veil piercing" under CERCLA's indirect liability provisions, but declined to resolve it because the parties did not raise the issue in that case. *Id.* at 63 n.9.

single entity by common owners).  Defendants' assertion that Plaintiffs must demonstrate that the corporate form was abused to commit a fraud under New York law is therefore incorrect.  In any event, New York law provides specifically in the context of a state preference claim that the veil can be pierced to "prevent fraud, illegality, or to achieve equity," which includes avoiding "the inequity [that] would result from the dealings of the directors and officers who owned both corporations without regard to the rights of creditors."  *Bartle v. Finkelstein*, 19 A.D.2d 256, 260-61 (4th Dep't 1963) ("Where a court of equity is seeking to adjust rights between parties it looks at the merits rather than at form and to that end will disregard the fiction of a separate corporate entity where justice requires that it should be done.").  The Amended Complaint satisfies the Second Circuit alter ego and veil piercing standards for either pure federal issues or mixed federal and state issues.

Before discussing the allegations in the Amended Complaint, however, it should be noted that this is a fact-driven inquiry that involves information that is not publicly available and is uniquely within Defendants' knowledge.  Courts in this District and others are mindful of this factor and, accordingly, have denied motions to dismiss veil piercing and alter ego claims in order to allow discovery to proceed.  *See Jiaxing Globallion Imp. & Exp. Co. v. Argington, Inc.*, 2012 U.S. Dist. LEXIS 48491, at *12 (E.D.N.Y. Apr. 2, 2012) ("plaintiffs in this case are not employees of the corporation and have no insider knowledge of its internal workings.  Given their limited understanding of the actual operations of [company], their allegations are sufficient to permit discovery on this claim."); *Dover Ltd. v. A.B. Watley, Inc.*, 2006 U.S. Dist. LEXIS 81391, at *30-32 (S.D.N.Y. Nov. 8, 2006) ("Until there has been an opportunity for discovery, there is no way for the Plaintiffs to know" facts relevant to veil piercing; denying motion to dismiss); *Official Comm. of Unsecured Creditors of Buckhead Am. Corp. v. Reliance Capital Group (In re Buckhead Am. Corp.)*, 178 B.R. 956, 975 (D. Del. 1994) ("the nature and extent of the dominion and control exercised ... is ... a question of fact, not subject to resolution on a motion to dismiss") (citations omitted); *Gabay v. Mostazafan Found. of Iran*, 151 F.R.D. 250, 256-57 (S.D.N.Y. 1993) (where plaintiffs proffered more than conclusory allegations,

inadmissible documents "suggest that admissible evidence might well be obtained if discovery were permitted" and thus were "sufficient to convince the court that dismissal of plaintiff's claim without discovery on the 'alter ego' issue would be premature").

*In re El Paso Corp. S'holder Litig.*, 2012 Del. Ch. LEXIS 46 (Del. Ch. Feb. 29, 2012), a recent opinion issued by the Delaware Chancery Court involving Goldman Sachs, demonstrates why discovery is critical.  There, in an apparent investment strategy that bears striking resemblance to Goldman and Capmark, Goldman Sachs owned approximately 19% of the stock of a potential merger partner of a company it was advising, and controlled two board seats of the potential merger partner, to which it appointed "two senior Goldman principals."  *Id.* at *21. Depositions, emails, and a draft script for a call to be made by Goldman Sachs's CEO to the company led the court to find that "measures . . . taken to cabin Goldman's conflict (for example, Goldman formally set up an internal 'Chinese wall' between the Goldman advisors to [the company] and the Goldman representatives responsible for the firm's investment) . . . were not effective," and that "Goldman . . .  claimed to step out of the process while failing to do so completely and while playing a key role in distorting the economic incentives."  *Id.* at *4, 22-29, 31-32, 42-43.  The court explained that "[a]t this stage, I am unwilling to view Goldman as exemplifying an Emersonian non-foolishly inconsistent approach to greed, one that involves seeking lucre in a conflicted situation while simultaneously putting the chance for greater lucre out of its 'collective' mind.  At this stage, I cannot readily accept the notion that Goldman would not seek to maximize the value of its ... investment in [potential merger partner] at the expense of" the company it was advising.  *Id.* at *41 (preliminary injunction denied on other grounds).[10]

While Defendants accurately cite *In re KCMVNO*, *supra*, for concluding that pleading *nothing* with respect to alter ego would render a complaint subject to dismissal, that is simply not the case here.  Even without discovery, the Amended Complaint meets the pleading standard.  In

---

[10]  Two other cases involving Goldman's internal workings were commenced only after government investigations revealed materials that otherwise would have become available only through discovery.  *See ACA Fin. Guar. Corp. v. Goldman, Sachs & Co.*, 35 Misc.3d  1217A (N.Y. Sup. Ct. 2012) (SEC investigation of Goldman resulted in $550 million settlement, followed by private civil litigation); *Richman v. Goldman Sachs Group, Inc*., 2012 U.S. Dist. LEXIS 86556 (S.D.N.Y. June 21, 2012) (class action claims following United States Senate investigation).

*Sykes v. Mel Harris & Assocs., LLC*, 757 F. Supp. 2d 413, 429-30 (S.D.N.Y. 2010), the

following allegations amounted, post-*Twombly* and *Iqbal*, to "a plausible claim of veil-piercing":

- [parent] is the parent corporation of the other seven . . . corporate defendants, which are wholly-owned subsidiaries of [parent] and remit all their profits directly to [parent];
- [parent] has complete control over the other seven corporate . . . entities' debt collection activities;
- [corporate owner LLC] is the sole corporate owner of [another LLC], which in turn is the sole corporate owner of all five [other subsidiaries];
- [individual] serves as vice president and CFO of [parent] while also serving as president of [other LLC] and all five [other subsidiaries].
- [individual] serves as [parent's] assistant vice president and director of taxes while also serving as vice president of [other LLC] and all five [subsidiaries];
- all eight corporate defendants share the same Manhattan address[.]

Here, the Amended Complaint alleges the very same circumstances at Goldman.  For example:

- The Goldman Sachs Group is the parent company of each Goldman Lender and Goldman Investor.  Three of the four Defendants are "significant subsidiaries" at least 99% owned by The Goldman Sachs Group.  Amended Complaint ¶ 69.
- The Goldman Lenders and Goldman Investors are wholly owned, dominated, and controlled by The Goldman Sachs Group.  *Id.* ¶¶ 22-25, 29, 72, 89.
- The Goldman Lenders, Goldman Investors, and The Goldman Sachs Group all operate as a single business enterprise and single economic entity solely to benefit The Goldman Sachs Group.  *Id.* ¶¶ 50, 70, 71, 73, 89(d)-(e), 94.
- The Goldman Lenders and Goldman Investors remit all their profits to, and/or cause their profits to inure to the benefit of, The Goldman Sachs Group – including with respect to the preferential transfers at issue here.  *Id.*
- The Goldman Sachs Group is ultimately responsible for and exercises complete control over all debt and equity holdings of its affiliates, including but not limited to the Goldman Lenders and Goldman Investors.  *Id.* ¶ 72.
- In public filings, Goldman refers to itself as one firm, "The Goldman Sachs Group, Inc.," discusses the finances of all of its business areas together, and reports consolidated financial results.  *Id.* ¶ 71, 89.
- Goldman's website refers to one entity, "Goldman Sachs," and to its various practice areas as "business segments" or "divisions" thereof.  *Id.* ¶ 73, 89(d).

Specifically as to Capmark, Plaintiffs also allege the following unified conduct, showing

no differentiation between the Goldman Lenders and Goldman Investors:

- At the direction and subject to the control and domination of The Goldman Sachs Group, the Goldman Lenders and Goldman Investors jointly entered into the LBO Transaction, a unified transaction consisting of an equity investment and loan agreements, with respect to which the Goldman Lenders and Goldman Investors were agents of Goldman.  *Id.* ¶¶ 33, 36-37, 87(g)-(h), 89-90.
- The GMACCH stockholders agreement provided that notices be provided directly to Goldman Sachs & Co. rather than to the Goldman Investors.  *Id.* ¶ 34.
- The Goldman Sachs Group filed Goldman's declaration of status as a substantial equity holder of the Debtors in the Debtors' bankruptcy proceedings.  *Id.* ¶ 72, 89(d).

17

- The LBO Transaction gave Goldman the right to appoint a member to Capmark's Board.  Goldman's chosen Board members were Managing Directors of The Goldman Sachs Group and not employees of the Goldman Lenders or Goldman Investors.  The Goldman-appointed Board members also served on the Board's Finance Committee, and Mr. Gross additionally sat on the Special Committee.  The Goldman Sachs Group's executives thus represented all the subsidiaries' interests as lenders and investors in Capmark.  *Id.* ¶¶ 34, 38, 52-62, 66-67, 74, 86-90, 101.
- The 2009 Secured Credit Facility was executed on behalf of Defendants by Managing Directors of The Goldman Sachs Group, and substantially all of Goldman's negotiations with Capmark regarding the LBO Transaction and Secured Credit Facility were conducted by The Goldman Sachs Group employees.  *Id.* ¶¶ 22-25, 55, 57, 61(a)-(e), 63-66, 76, 89(f).
- Defendants were mere agents of The Goldman Sachs Group with respect to the Secured Credit Facility and could not have entered into the transaction without its approval and the signatures of its employees.  *Id.* ¶ 89.
- Goldman entities, including Goldman Sachs & Co., obtained multiple agency and advisory positions in the Debtors' debt and securities transactions, demonstrating that the firm as a whole benefitted from the subsidiaries' debt and equity interests.  *Id.* ¶¶ 35, 39-41, 79, 101(e).

Thus, Plaintiffs plead substantially more factual information than courts in this District have required to justify an inference that the Goldman Investors' statutory insider status is attributable to Defendants via any of the imputation, alter ego, agency, and/or veil piercing theories described above.  *See also Maung Ng We v. Merrill Lynch & Co.*, 2000 U.S. Dist. LEXIS 11660, at *22 (S.D.N.Y. Aug. 14, 2000) (inability to act without corporate parent's approval is "the epitome of control"); *cf. Sysco Food Serv. of Metro N.Y., LLC v. Jekyll & Hyde, Inc.*, 2009 U.S. Dist. LEXIS 108317, at *7-11 (S.D.N.Y. Nov. 17, 2009) (allegations that insolvent entities mingled assets and liabilities and were all responsible for payment due plaintiff, with no factual support or description of relationship between corporations, were not enough; veil piercing count dismissed *without* prejudice).  Under both the federal and state standards, it would be inequitable to allow Defendants to avoid preference liability by artificially separating the lending and investing functions without any true practical difference so that Defendants can pretend that they are entirely separate from the inside Goldman Investors.  This inequity requires denial of the motion to dismiss.

**B.**   **Plaintiffs Have Adequately Pleaded that Defendants were Non-Statutory Insiders**

In addition to demonstrating that the Goldman Investors' indisputable status as statutory insiders of Capmark is imputed to Defendants, the Amended Complaint sets forth a more than

facially plausible claim that Defendants themselves were non-statutory insiders.  Bankruptcy Code Section 101(31) provides that "insider" *includes* the enumerated categories listed. 11 U.S.C. § 101(31).  But insider status does not end with the list.  "Persons specified in the six subdivisions of Section 101(31)(B) are generally referred to as 'statutory' insiders.  But in providing that the term insider 'includes' the statutory insiders, Congress made clear that 'insider' is not limited to these six categories.  Thus, the statutory list is not exhaustive, and it is for the courts to define the limits of non-statutory insider status."  *Hirsch v. Va. Tarricone (In re A. Tarricone, Inc.)*, 286 B.R. 256, 262 (Bankr. S.D.N.Y. 2002).  The Amended Complaint demonstrates that Defendants' non-statutory insider status arises out of their close relationship with the Debtors and their role in the Debtors' business in connection with various transactions over the years, including the preference transaction at issue here.

### 1. Insider Status Should Not be Determined on a Motion to Dismiss

Non-statutory insider status involves a flexible, fact-intensive inquiry that is ordinarily not resolvable on a motion to dismiss, as was true with imputation discussed above.  It "is a question of fact.  On that basis alone, the issue of insider status is not particularly suited to disposition by summary judgment" or, necessarily, by motion to dismiss.  *In re Chas. P. Young Co.*, 145 B.R. 131, 137-38 (Bankr. S.D.N.Y. 1992) (citations omitted).  "[I]nsider status must be determined on a case by case basis through examination of the totality of the circumstances and the creditor's degree of involvement in the debtor's affairs."  *Id.* at 136.  In *OHC Liquidation Trust v. Credit Suisse First Boston (In re Oakwood Homes Corp.)*, where the complaint alleged "a long-standing multifaceted relationship," much like existed here, the court found that "a determination of insider status must await further discovery."  340 B.R. 510, 524 (Bankr. D. Del. 2006); s*ee also Official Unsecured Creditors' Comm. of Broadstripe, LLC v. Highland Capital Mgmt., L.P. (In re Broadstripe, LLC)*, 444 B.R. 51, 80-81, 85-86 (Bankr. D. Del. 2010) (summary judgment denied where insider status required factual determination); *Floyd v. Hefner*, 556 F. Supp. 2d 617, 658 (S.D. Tex. 2008) ("Insider status is ultimately a question of fact");

*Tomsic v. Sales Consultants of Boston, Inc. (In re Salience Assocs.)*, 371 B.R. 578, 585-86
(Bankr. D. Mass. 2007) (same).

> **2.      The Goldman Lenders Had a Close Relationship with the
> Debtors and with Statutory Insiders of the Debtors and
> Did Not Deal with the Debtors at Arm's Length**

As with Defendants' discussion of statutory insider status, they are either misreading or
misleading in their discussion of the case law.  Even under their own cases (Def. Br. at 15),
courts find non-statutory insider status where there is "a close relationship between debtor and
creditor" and "*anything* other than closeness to suggest that *any transactions* were not conducted
at arm's length."  *Shubert v. Lucent Techs., Inc. (In re Winstar Commc'ns, Inc.)*, 554 F.3d 382,
396-97 (3d Cir. 2009) (citations omitted) (emphasis added).  "In determining whether a person is
a non-statutory insider, courts have generally focused on two basic factors: (1) the closeness of
the relationship between the debtor and the transferee, and (2) whether the transactions between
the transferee and the debtor were conducted at arm's length."  *Tarricone*, 286 B.R. at 262
(collecting cases).  The relevant inquiry to Defendants' non-statutory insider status, therefore, is
whether they had a close relationship with the Debtors and whether *anything* other than closeness
*suggests* that *any transactions* between Defendants and the Debtors were not conducted at arm's
length.  *See*, *e.g.*, *In re Foothills Texas, Inc.*, 408 B.R. 573, 583 n.46 (Bankr. D. Del. 2009)
(noting that "the court . . . used 'any transaction' not 'transaction before the court' or similar
language."); *Anstine v. Carl Zeiss Meditec AG (In re U.S. Medical, Inc.)*, 531 F.3d 1272, 1280
(10th Cir. 2008) (looking at "all relations between Creditor and Debtor" not just the transaction
at issue to determine non-statutory insider status).[11]

A party may also qualify as a non-statutory insider if it has a close relationship with a
statutory insider of the debtor – the relationship does not have to be with the debtor itself.  In
*Floyd*, 556 F. Supp. 2d at 658-59, the court found questions of fact precluding summary

---

[11]  This two-prong insider test was derived from the legislative history of Bankruptcy Code section 101(31), which
states that "[a]n insider is one who has a sufficiently close relationship with the debtor that his conduct is made
subject to closer scrutiny than those dealing at arms length with the debtor." H.R. Rep. No. 95-595, 1st Sess., at 312
(1977), *reprinted in* 1978 U.S.C.C.A.N. 5963, 6269; *see also Tarricone*, 286 B.R. at 262.

judgment because a reasonable jury could conclude that the entities' contacts with the debtor's statutory insiders created a sufficiently close relationship with the debtor to be considered insiders as well.  As the court put it clearly in *Tarricone*, 286 B.R. at 263:

> Since Congress listed as statutory insiders those persons with a direct relationship to the debtor ... it cannot be supposed that non-statutory insiders must also have a direct relationship redundant of what is already in subsections (i)-(vi).  Moreover, Section 101(31)(B)(vi) expressly extends insider status to persons who have no formal relationship at all with the corporate debtor, namely, relatives of insiders. Having provided that statutory insiders like relatives need have no direct relationship to the debtor, there is no reason to suppose that Congress intended a different rule for non-statutory insiders.

Here, Defendants' close relationship with two statutory insiders of the Debtors – (i) Mr. Gross, a senior executive (a Managing Director) of their controlling parent company The Goldman Sachs Group, was a member of the Board of parent Debtor Capmark, and (ii) their commonly-operated sister companies, the Goldman Investors, were members of GMACCH, which owned approximately 74% of Capmark – satisfies the non-statutory insider analysis.  *Id.* at 263-64 ("creditors with no direct relationship with the debtor (other than as creditor) may be deemed non-statutory insiders by virtue of their close personal relationship with persons who are statutory insiders").  These relationships can be explored in discovery but these allegations of closeness in the Amended Complaint pass the *Iqbal* and *Twombly* plausibility test.

Furthermore, "[t]he term 'insider' is used in more than fifteen sections of the Bankruptcy Code [so] it is appropriate to consider the purpose of the particular statute in which the term 'insider' is used" when determining whether someone is an insider.  *In re Standard Stores, Inc.*, 124 B.R. 318, 324 (Bankr. C.D. Cal. 1991) (quotations omitted).  With respect to a preference under section 547, a plaintiff "is not required to prove that the transferee knew or should have known: (1) that the transfer was preferential; (2) that the debtor was insolvent at the time of the transfer; or (3) any other pertinent factor."  *Id.* (citation omitted).  Being an insider for preference purposes does not require any evidence of wrongdoing – only that the insider received a greater recovery than other similarly situated creditors who were not insiders.  Therefore, the primary focus for insider status here is on the close relationship between Defendants and the Debtors

and/or between Defendants and other insiders of the Debtors, which can be shown by a variety of factors including a number of non-arm's length transactions over the years, rather than whether the parties dealt at arm's length specifically in negotiating the Secured Credit Facility at issue. Nonetheless, the Amended Complaint contains detailed allegations that Defendants and their affiliated Goldman entities were actively involved in the events and discussions that led to the Secured Credit Facility. Am. Compl. ¶¶ 52, 54-66.

In light of these plausible allegations, Defendants try to impose a higher standard. They argue that "ordinary commercial lenders" will qualify as non-statutory insiders only if there is a "high level of control by the lender," such as "dictat[ing] day-to-day management and operation of the debtor." Def. Br. at 16-17. The cases they cite, however (*Champion*, 2010 Bankr. LEXIS 2720 at \*18, and *In re KCMVNO*, 2010 Bankr LEXIS 3669 at \*11), are inapposite because those defendants were outside "ordinary commercial lenders" with no connection to the debtors' controlling investors such as Defendants had here through the LBO Transaction. Rather:

> The 'control' to which [non-statutory insider cases] refer can only correctly be interpreted as something short of actual, legal control over the debtor's business because 'actual control' would subject the creditor to the statutory category of 'person in control of the debtor' under 11 U.S.C. § 101(31). Any interpretation of 'control' within the non-statutory-insider context as anything like the ability 'to order, organize or direct' the debtor's operations is simply incorrect.

*U.S. Medical*, 531 F.3d at 1277 n.5. Having "[a]ccess to inside information can be sufficient to confer insider status even where there is no legal right or ability to exercise control over a corporate entity." *In re Krehl*, 86 F.3d 737, 743 (7th Cir. 1996). Defendants had such access to inside, non-public information. *See* Am. Compl. ¶¶ 62, 65, 88.[12]

In *Exide*, 299 B.R. 732, 743 (Bankr. D. Del. 2003), where the facts were similar to those here, the court found that the plaintiffs sufficiently pleaded an insider preference claim. There, the lenders exerted financial leverage over the debtors in a manner that effectively permitted

---

[12] In *Champion*, the independence of the board of directors was a key factor in the court's decision rejecting insider status, and the court contrasted the situation with another case where "the lenders allegedly caused the debtor's board of directors to replace an officer with a lender-friendly individual." *Champion*, 2010 Bankr. LEXIS 2720, at \*23-25, n.8 (comparing *Official Comm. of Unsecured Creditors v. Credit Suisse First Boston (In re Exide Techs., Inc.)*, 299 B.R. 732, 743 (Bankr. D. Del. 2003)). Here, Goldman had a representative on Capmark's Board and was a member of an investor group with a 74% ownership interest in the Debtors.

them to control the debtors.  *Id.*  Specifically, the pre-petition lenders caused the debtors to put a lender-friendly chief financial officer in place, *Id.* at 744-45, and caused the company to enter into a transaction when it was already insolvent, by providing both the underwriting services and financing necessary for the transaction.  *Id.* at 743.  Finally, the plaintiffs pointed to the timing of the bankruptcy filing, which was suspiciously soon after the 90-day statutory non-insider preference period, as being designed to avoid non-insider preference claims against the lenders. *Id*.  The court found "both a source of power and alleged instances in which power was exercised" by the lenders, and denied the motion to dismiss.  *Id*.

Here, as detailed in the sections above, Defendants had a Board representative who served on the Finance Committee and the Special Committee with the duty to manage the debt burden arising from their own loans, Goldman was selected repeatedly during the three year relationship as a financial advisor and underwriter without any indication that there was a non-arm's length search for other entities, and Goldman employees with both lending and investing responsibilities were invited to meetings to discuss the loans at issue here while other parties who did not have this dual relationship were not invited.  Am. Compl. ¶ 57.  Goldman representatives (not just Mr. Gross) attended at least thirteen Board meetings to discuss these loans prior to the refinancing and preference payments.  *Id*. ¶¶ 60-61.  And Mr. Gross participated in the decision not to file a bankruptcy petition within the 90-day preference period that would have required his firm to return the full $145 million at issue here as a matter of law. *Id*. ¶ 67.  These and the other facts discussed in this brief sufficiently demonstrate that Defendants and their affiliates had a sufficiently close relationship with Capmark such that there is an inference that they were not dealing at arm's length.[13]

---

[13]  Defendants' assertion that certain Capmark employees testified in the bankruptcy that the Goldman Lenders did not participate in specific negotiations of the terms of the Secured Credit Facility (Def. Br. at 17), even if proper on a motion to dismiss, is irrelevant.  As discussed, there is documentary evidence that Goldman employees were involved in many discussions that led to the preferential payments. Further, the non-arms length nature of the activity does not have to relate to the specific challenged payment, and there are sufficient allegations that Defendants' representatives participated in other non-arms length transactions as well.

**C.**   **Neither Judicial Nor Collateral Estoppel Applies to Bar Plaintiffs' Claims**

This Court has already ruled, in a well-reasoned opinion just five months ago, that Judge Sontchi's decision approving Capmark's settlement of certain fraudulent conveyance against other parties does not estop Plaintiffs from bringing this claim.  Kaminetzky Decl. Ex. B. Defendants' effort to revisit the question on this motion is no more meritorious than it was then.

Plaintiffs are not judicially estopped.  "Typically, judicial estoppel will apply if:  1) a party's later position is 'clearly inconsistent' with its earlier position; 2) the party's former position has been adopted in some way by the court in the earlier proceeding; and 3) the party asserting the two positions would derive an unfair advantage against the party seeking estoppel.'"  *Adelphia Recovery Trust v. HSBC Bank USA (In re Adelphia Recovery Trust)*, 634 F.3d 678, 695-96 (2d Cir. 2011) (citation omitted).  Contrary to Defendants' focus on alleged unfair advantage to Plaintiffs, courts may analyze the third requirement "in terms of 'unfair detriment [to] the opposing party' rather than advantage to the party to be estopped."  *Id.*

As this Court correctly concluded, the Debtors' alleged representations in the bankruptcy were made in support of a settlement that *expressly carved out for later prosecution* the very claims subject to this action.  That court did not adopt a position that these claims were not meritorious, Plaintiffs did not receive an unjust benefit by supporting that settlement, nor did Defendants put themselves in any unjust position in this case because they relied on that support. To the contrary, they understood that this claim would survive and be pursued after the settlement and urged Plaintiffs' predecessors to "bring it on."  Venue Opinion at 14, 21.

Nor can Defendants prove collateral estoppel, which requires four elements:  "'(1) the identical issue was raised in a previous proceeding; (2) the issue was actually litigated and decided in the previous proceeding; (3) the party had a full and fair opportunity to litigate the issue; and (4) the resolution of the issue was necessary to support a valid and final judgment on the merits.'"  *Ball v. A.O. Smith Corp.*, 451 F.3d 66, 69 (2d Cir. 2006) (quoting *Purdy v. Zeldes*, 337 F.3d 253, 258 & n.5 (2d Cir. 2003)).  Again, this Court has already concluded that the issues here were not identical or necessarily included in Judge Sontchi's decision.  This Court ruled that

"[t]he issues concerning the Defendants' insider status were not actually litigated and decided at the settlement hearing, but rather were expressly carved out of the Bankruptcy Court's Opinion." Venue Opinion at 21. This Court unequivocally found that "in this case, neither res judicata nor collateral estoppel applies," "Judge Sontchi's 'Findings and Conclusions' approved the settlement of other avoidance actions," and "[t]he merits of the insider preference claims were never addressed." *Id.* at 19-20.

Defendants' repeated talismanic reference to Judge Sontchi's 93-page decision is a red herring. In that entire decision there are *two sentences* that refer to preference claims. On page 88, he noted that the settled claims did not involve a preference because the payments occurred more than 90 days pre-bankruptcy, without mentioning the issue of insider status. Kaminetzky Decl. Ex. B. at 88. On page 92, he stated that standing to pursue these preference claims against Goldman was moot because the settlement resolved them. *Id*. at 92. The first statement was irrelevant because he never considered the insider issue and the second was erroneous, as Judge Sontchi realized when he reversed himself on that point. There is nothing in that decision that would satisfy the collateral estoppel standards so as to bar this claim. Indeed, Defendants' citations to Judge Sontchi's factual findings throughout their motion are inappropriate as going beyond the four corners of the Amended Complaint. Those findings are not binding on this Court nor proper sources on a motion to dismiss. *DiFolco v. MSNBC Cable L.L.C.*, 622 F.3d 104, 111 (2d Cir. 2010) (only facts in the complaint, documents incorporated by reference, or documents integral to the complaint as to which there is no factual dispute may be considered on a motion to dismiss).[14]

---

[14]  The Court's Venue Opinion also constitutes law of the case. "The law of the case doctrine counsels against revisiting ... prior rulings in subsequent stages of the same case absent 'cogent' and 'compelling' reasons such as 'an intervening change of controlling law, the availability of new evidence, or the need to correct a clear error or prevent manifest injustice.'" *United States v. Thorn*, 446 F.3d 378, 383 (2d Cir. 2006) (quoting *United States v. Tenzer*, 213 F.3d 34, 39 (2d Cir. 2000)). Defendants do not allege that such extreme circumstances exist here. Instead, they argue that the issue of collateral estoppel was not before this Court. Not only was collateral estoppel squarely before this Court in the Venue Opinion, it was Defendants that put it there. They argued that the Delaware Bankruptcy Court was in the best position to determine these collateral estoppel issues. This Court had to decide whether there was any merit to this collateral estoppel argument. That Defendants do not like the Court's decision does not constitute a "cogent" or "compelling" reason to disregard the law of the case doctrine.

## <u>CONCLUSION</u>

For the foregoing reasons, the Motion to Dismiss should be denied.

Dated: August 10, 2012
      New York, New York

                      KASOWITZ, BENSON, TORRES
                       & FRIEDMAN LLP


                      By: /s/ Michael C. Harwood
                        Michael C. Harwood (mharwood@kasowitz.com)
                        Adam L. Shiff (ashiff@kasowitz.com)
                        Jeffrey R. Gleit (jgleit@kasowitz.com)
                        Michele L. Angell (mangell@kasowitz.com)
                      1633 Broadway
                      New York, New York 10019
                      (212) 506-1700

                      *Counsel for Plaintiffs*