UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

-----------------------------------------------X

CAPMARK FINANCIAL GROUP INC.; SUMMIT
CREST VENTURES, LLC; CAPMARK CAPITAL LLC
(F/K/A CAPMARK CAPITAL INC.); CAPMARK            11 Civ. 7511
FINANCE LLC (F/K/A CAPMARK FINANCE INC.);
COMMERCIAL EQUITY INVESTMENTS LLC (F/K/A             OPINION
COMMERCIAL EQUITY INVESTMENTS INC.);
MORTGAGE INVESTMENTS LLC; NET LEASE
ACQUISITION LLC; SJM CAP, LLC; CAPMARK
AFFORDABLE EQUITY HOLDINGS LLC (F/K/A
CAPMARK AFFORDABLE EQUITY HOLDINGS INC.);
CAPMARK REO HOLDING LLC; AND CAPMARK
INVESTMENTS LP,

                    Plaintiffs,

     -against-

GOLDMAN SACHS CREDIT PARTNERS L.P.; GOLDMAN
SACHS CANADA CREDIT PARTNERS CO.; GOLDMAN
SACHS MORTGAGE COMPANY; AND GOLDMAN SACHS
LENDING PARTNERS LLC,

                    Defendants.

-----------------------------------------------X



A P P E A R A N C E S:

          Attorneys for Plaintiffs

          KASOWITZ, BENSON, TORRES & FRIEDMAN LLP
          1633 Broadway
          New York, NY  10019
          By:  Michael C. Harwood, Esq.
               Adam L. Shiff, Esq.

          Attorneys for Defendants

          DAVIS POLK & WARDWELL LLP
          450 Lexington Avenue
          New York, NY  10017
          By:  Benjamin S. Kaminetzky, Esq.
               Andrew D. Schlichter, Esq.

**Sweet, D.J.**

Defendants Goldman Sachs Credit Partners L.P., Goldman Sachs Canada Credit Partners Co., Goldman Sachs Mortgage Company, and Goldman Sachs Lending Partners LLC (the "Goldman Lenders" or the "Defendants"), have moved pursuant to Rule 12(b)(6) of the Federal Rule of Civil Procedure to dismiss the Amended Complaint (the "AC") of plaintiffs Capmark Financial Group Inc. ("CFGI"), Summit Crest Ventures, LLC, Capmark Capital LLC (f/k/a Capmark Capital Inc.), Capmark Finance LLC (f/k/a Capmark Finance Inc.), Commercial Equity Investments LLC (f/k/a Commercial Equity Investments, Inc.), Mortgage Investments, LLC, Net Lease Acquisition LLC, SJM Cap, LLC, Capmark Affordable Equity Holdings LLC (f/k/a Capmark Affordable Equity Holdings Inc.), Capmark REO Holding LLC, and Capmark Investments LP (collectively, with CFGI, the "Plaintiffs" or "Capmark").

The issues presented here arise out of the complex transactions surrounding the $8.7 billion leveraged buyout of CFGI in 2006, a restructuring of its debt and its bankruptcy in 2009, in which the Goldman Lenders and other entities or affiliates of the Goldman Sachs Group Inc. (the "Goldman Sachs Group"), the parent of the Goldman Lenders were involved.  The

1

AC asserts claims that the $145 million payment to the Goldman
Lenders was a preferential transfer that must be avoided because
the Goldman Sachs, though its affiliates, were statutory and
non-statutory insiders.  The Plaintiffs seek to overcome the
corporate differentiations and the Goldman Lenders insist upon
their preservation.  Able counsel has presented the complicated
issues with skill and diligence.

These distinctions in form are relied upon by
participants in structuring complex financial transactions such
as those presented here and Plaintiff's present position is a
reversal of their prior representations.  Upon the conclusions
set forth below, the motion of the Goldman Lenders is granted
and the AC is dismissed.

## I. <u>Prior Proceedings</u>

The Plaintiffs' predecessors (the "Debtors") entered
into two unsecured credit facilities in March 2006, pursuant to
which they incurred $8.7 billion in unsecured debt from various
lenders, including the Defendants.  In connection with this
loan, Goldman Sachs Group managed the PIA Funds, which along
with other lenders, created a limited liability company that

owned 74% of CFGI.  In May 2009, the Debtors partially repaid
this debt by entering into a $1.5 billion secured credit
facility.

According to the Plaintiffs, as a lender with a member
on CFGI's Board of Directors, the Goldman Lenders stood on both
sides of this new loan.  The Plaintiffs contend that, as a
result of this transaction, the Defendants received $147 million
to reduce their unsecured loan and held a new secured loan that
was better positioned to receive payment in full when the
Plaintiffs' predecessor entity declared bankruptcy in October
2009.

After several months of unsuccessful attempts to
negotiate a comprehensive out-of-court restructuring, on October
25, 2009, Capmark commenced voluntary Chapter 11 proceedings in
the United States Bankruptcy Court for the District of Delaware
before the Honorable Christopher S. Sontchi.

According to Defendants, on August 10, 2010, the
Official Committee of Unsecured Creditors (the "Committee")
filed a motion seeking standing to pursue, among other things,
the same preference claims against the Goldman Lenders that are

3

now at issue in this litigation.  After briefing and discovery

on the Committee's standing motion and a closely-related

settlement involving broader claims against all secured lenders

on October 14, 2010, Judge Sontchi commenced a five-day

evidentiary hearing to consider both the settlement and the

Committee's standing motion.  Capmark took the position that the

Committee's preference claims "cannot satisfy the test for

colorability" and "are insufficient to survive the pleadings

stage, much less present any likelihood of success on the

merits."  (Kaminetzky Decl., Ex. D. at ¶¶ 43, 80).

On November 1, 2010, Judge Sontchi issued a ninety-

three document entitled "Findings of Fact and Conclusions" of

Law (the "Findings and Conclusions") in which he, among other

things, approved the settlement and denied as moot the

Committee's motion for standing to pursue the preference claims.

The Committee filed a motion for reconsideration as to

its standing to pursue the preference claims.  Judge Sontchi

held a hearing on the Committee's reconsideration motion on

April 11, 2011.  According to the Defendants, at that hearing,

Judge Sontchi explained that while he did not consciously intend

to characterize the Committee's preference claims as moot, he

4

stood ready to expand upon his Findings and Conclusions to
address those claims.  The Defendants contend that when it
became increasingly apparent that Judge Sontchi might issue a
definitive adverse ruling on the merits as to the preference
claims, the Committee sought to withdraw its standing motion
without prejudice with leave to refile.  When Judge Sontchi
refused, stating that any dismissal or withdrawal of the motion
would be with prejudice, the Committee withdrew with prejudice
its motion for standing to pursue the preference claims.  The
Plaintiffs' disagree with the Defendants' characterization of
the April 2011 hearing, instead noting that the Bankruptcy Court
acknowledged that its opinion was not intended to address the
Committee's standing to bring the insider preference claims,
which were independent of the approved settlement.

     According to the Defendants, Judge Sontchi, in his
order approving the Committee's withdrawal of its standing
motion with prejudice, expressly reserved the Goldman Sachs
creditors' right to argue that the Plaintiffs, as the
reorganized entity emerging out of the Chapter 11 proceedings,
are the alter ego of the Committee, and, as such, are likewise
precluded from asserting the preference claims.  The Defendants
also contend that the Bankruptcy Court reserved jurisdiction

5

over this issue.  The Plaintiffs dispute this characterization

of the Bankruptcy Court's order.  According to the Plaintiffs,

on August 24, 2011, Judge Sontchi confirmed the debtors' plan or

reorganization, under which the Plaintiffs retained the right to

prosecute the insider preference claims that are the subject of

this action.

On September 30, 2011, Capmark emerged from

bankruptcy, the Committee was dissolved, and the Committee's

constituents acquired over 99% of the equity in the Plaintiffs,

who constitute the reorganized debtor that emerged from the

bankruptcy proceedings.

On October 24, 2011, the Plaintiffs commenced the

present action in the Southern District of New York seeking to

recover, as insider preferences, $147 million in transfers made

by the Plaintiffs' predecessors to the Defendants within a year

before the Debtors filed their petitions for reorganization in

bankruptcy.  According to the Defendants, the Plaintiffs in this

action are the Committee in a different guise, represented by

the same counsel, seeking the same relief that the Committee

earlier sought before Judge Sontchi.

On May 18, 2012, Plaintiffs filed the AC, alleging that the Goldman Lenders were Capmark insiders, and that transfers allegedly made to the Goldman Lenders in connection with the Secured Credit Facility beyond the normal ninety-day preference period can be avoided pursuant to 11 U.S.C. § 547(b)(4)(B).  (AC ¶¶ 82-102).  Plaintiffs also allege that the Goldman Lenders were statutory insiders pursuant to 11 U.S.C. § 101, and non-statutory insiders under applicable case law. (Id.).

The instant motion to dismiss the AC was heard and marked fully submitted on November 14, 2012.

## II.  **Background**

The facts are taken from the AC and the declarations submitted by the parties and are not in dispute except as noted below.

.

7

The Goldman Lenders are four lender subsidiaries of The Goldman Sachs Group.  The Plaintiffs are CFGI and ten of its reorganized debtor affiliates.[1]

On March 23, 2006, several affiliates of The Goldman Sachs Group entered into a package of intertwined agreements constituting leveraged buyout (the "LBO Transaction") of what became CFGI. (AC ¶¶ 2, 29-36).  The PIA Funds along with other investors became members of GMACCH, which acquired approximately 75% controlling ownership stake in CGFI.  (Id. ¶¶ 2, 29).  The PIA Funds are four legally and operationally distinct limited partnerships primarily consisting of investor capital and managed by The Goldman Sachs Group's Principal Investment Area.[2] (Id. ¶ 29).  The PIA Funds held a 19.8% ownership interest in GMACCH and allegedly became a majority owner of CFGI together with its fellow LLC members.  (Id. ¶¶ 2, 29).  One designee to Capmark's Board of Directors was appointed by the PIA Funds. (Id. ¶ 86).

---

[1] All references to CFGI and its reorganized debtor affiliates as they existed prior to the effective date of the Third Amended Joint Plan of Capmark Financial Group, Inc. and certain of its affiliated proponent debtors under chapter 11 of the Bankruptcy Code (the "Plan") shall be to CFGI and its affiliates as they existed prior to consummation of the Plan.

[2] The PIA Funds consist of CS Capital Partners V Fund, L.P., GS Capital Partners V Offshore Fund, L.P., GS Capital Partners V GmbH & Co. KG, and GS Capital Partners V Institutional, L.P.

The Goldman Lenders acquired positions in two loans to
Capmark to finance the LBO Transaction: (i) a $5.5 billion
Unsecured Credit Facility dated March 23, 2006 (the "2006 Credit
Facility") with Defendant Goldman Sachs Credit Partners L.P. as
the Documentation Agent; and (ii) a $5.25 billion Unsecured
Bridge Loan dated March 23, 2006 (the "Bridge Loan"), with
Defendant Goldman Sachs Credit Partners L.P. acting as a
Documentation Agent, Joint Lead Arranger, and Joint Bookrunner.
(Id. ¶ 31).

According to the Plaintiffs, the debt and equity
aspects of the investment in Capmark were inextricably
intertwined, as neither the loans nor the acquisition would have
occurred without the other.  (Id. ¶ 33).  The acquisition by
GMACCH was conditioned on the execution of the Pre-Petition
Credit Facilities by the Goldman Lenders pursuant to a
commitment letter issued by, among others, Defendant Goldman
Sachs Credit Partners L.P.  (Id.).  At the same March 23, 2006
closing, CFGI also entered into an agreement to retain Goldman
Sachs & Co. to provide management, monitoring, and advisory
services to Capmark for a fee of approximately $4 million per

9

year, to increase by 5% annually, regardless of whether any services were provided.  (Id. ¶ 35).

From 2006 through 2009, three managing directors of Goldman Sachs Group, including Stephen Trevor ("Trevor"), Stuart Katz ("Katz") and Bradley Gross ("Gross") served in seriatim on the Capmark Board. (Id. ¶ 38).  According to the Plaintiffs, throughout the managing directors' respective tenures, each acted as an agent and representative of Defendants, Goldman Sachs Group. and the Goldman Lenders.  (Id.).  Each also became a member of the Capmark Board's Risk, Controls and Finance Committee ("Finance Committee").  (Id. ¶¶ 2, 38).  In addition, Gross allegedly remained in regular communication regarding CGFI with Goldman Sachs' employees involved in both its lending and investment business.  (Id. ¶ 52).

Plaintiffs allege that over the span of two years, the CFGI Board approved the private placement of certain notes and engaged in an exchange offer which benefited the Goldman Lenders.  For example, CGFI refinanced some of the LBO Transaction, which allowed the Goldman Lenders to receive early repayment of some debt and to reduce some of the debt burden of the company it now allegedly owned.  (Id. ¶ 39).  Specifically,

in May 2007, CGFI issued $2.55 billion of senior unsecured notes in a private placement. (Id.). Goldman, Sachs & Co., which was over 98% owned by The Goldman Sachs Group served as the Global Coordinator and Bookrunner of the Note offering, for which it received substantial compensation. (Id.). In addition, nearly all the proceeds from the Note issuance were used to repay a portion of the Bridge Loan that was owed to Defendants. (Id.).

Plaintiffs contend that The Goldman Sachs Group's controlled affiliates possessed a controlling interest in Capmark, as the lead lenders, managers and advisors, and had a representative on Capmark's Board. (Id. ¶¶ 29, 31, 34-36). They aver that the participants in the LBO Transaction intended, understood, and represented to the investing public that all parts of the LBO Transaction were and should be viewed as one unified transaction. (Id. ¶ 37). By virtue of this LBO Transaction, the Goldman Lenders and their affiliated parent and Goldman Investors allegedly acted jointly to become lenders, owners, and managers of CFGI. (Id. ¶ 36).

In May 2008, CFGI also engaged in an exchange offer pursuant to which it exchanged the $2.55 billion of privately offered 2007 Notes for publicly tradable notes. (Id. ¶ 40).

11

Goldman, Sachs & Co. was chosen as the underwriter of the 2008
exchange offer, for which it again received substantial
compensation. (Id.). The Board noted that Goldman Sachs &
Co.'s role as lead underwriter made it necessary for CFGI to
file an SEC Form S-1 shelf registration disclosing "Goldman
Sachs' affiliation with the Company by virtue of its ownership
interest and Board representation." (Id. ¶ 42). CFGI did not
distinguish in the SEC filing among the various Goldman entities
serving as an owner, a Board member, a lender, and an
underwriter when it disclosed "Goldman Sachs' affiliation."
(Id.).

          In late 2008, because of credit-market turmoil and a
related decline in the value of its mortgage-related holdings,
CFGI found itself in a challenging financial situation and
expected to incur a substantial loss in the fourth quarter.
(Id. ¶¶ 4, 53). Accordingly, CFGI explored alternatives aimed
at extending the maturity of their debt and potentially
converting debt to equity to stabilize their balance sheet for
the long term. (Id.). The Debtors' most pressing financial
challenge was the impending March 23, 2009 due date for the
principal balance of $833 million on the Bridge Loan owed to the
Goldman Lenders, among others. (Id.).

                              12

To deal with these financial difficulties, CFGI's
Board appointed a special committee (the "Special Committee") to
consider strategic restructuring alternatives. (Id. ¶ 54).
According to Plaintiffs, Gross and other Goldman employees
participated in numerous Special Committee and Board meetings
and were involved with major decisions regarding how to deal
with the impending debt payment. (Id. ¶¶ 52, 54-63). After
extensive negotiations, on May 29, 2009, CFGI other debtor
guarantors, with CFGI Board's approval,[3] entered into the 2006
Credit Facility or Bridge Loan with the Goldman Lenders and
various other lenders. Pursuant to that agreement, CFGI secured
a new $1.5 billion secured term loan facility (the "Secured
Credit Facility") to pay down the same amount of the 2006 Credit
Facility. (Id. ¶¶ 44, 47). CFGI also granted security
interests in nearly all its U.S. and Canadian mortgage loan
assets and foreclosed real estate, other than its ownership of
and the assets of Capmark Bank. (Id. ¶¶ 45-46).

According to Plaintiffs, the Secured Credit Facility
thus replaced unsecured debt with Secured Debt, which was better

---

[3] Although Gross participated in the Board's discussions of this loan, he
ultimately abstained from the vote on the resolution to protect Goldman's
conflicted positions. (Id. ¶¶ 4, 52, 60).

positioned to be paid in full when the Debtors entered
bankruptcy five months later. (Id. ¶ 48). The Secured Credit
Facility had repayment terms that were allegedly less favorable
to CFGI than the 2006 Credit Facility and Bridge Loan, including
a higher "Base Rate" interest rate, an additional "Applicable
Margin" of 1.5% per year above the "Base Rate," and an
additional "Applicable Margin" of 2.5% per year for "Eurodollar
Rate Advances," as well as imposing liens on most of its non-
CGFI Bank properties. (Id. ¶¶ 46, 51).

        In addition, the Goldman Lenders, as Lenders on the
2006 Credit Facility and Bridge Loan, received $145,623,054 from
CFGI's Secured Credit Facility and cash payment, as further
detailed in the AC. (Id. ¶¶ 91-93). Less than 90 days later,
the CFGI Board considered filing for bankruptcy within the 90
day preference period that would have required the Goldman
Lenders to return these payments regardless of whether they were
insiders, but the Board, including Gross, decided to wait until
after the preference period expired. (Id. ¶¶ 7, 67). CFGI filed
its Chapter 11 petition less than two months after this
preference period expired. (Id. ¶¶ 7, 68).


III. **The Applicable Standard**

                                14

In considering a motion to dismiss pursuant to Rule 12(b)(6), the Court construes the complaint liberally, accepting all factual allegations as true and drawing all reasonable inferences in the plaintiff's favor. Mills v. Polar Molecular Corp., 12 F.3d 1170, 1174 (2d Cir. 1993). The issue "is not whether a plaintiff will ultimately prevail but whether the claimant is entitled to offer evidence to support the claims." Villager Pond, Inc. v. Town of Darien, 56 F.3d 375, 378 (2d Cir. 1995) (quoting Scheuer v. Rhodes, 416 U.S. 232, 235-36, 94 S. Ct. 1683, 40 L. Ed. 2d 90 (1974)).

To survive dismissal, "a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" Ashcroft v. Iqbal, 556 U.S. 662, 129 S. Ct. 1937, 1949, 173 L. Ed. 2d 868 (2009) (quoting Bell Atl. Corp. v. Twombly, 550 U.S. 544, 570, 127 S. Ct. 1955, 167 L. Ed. 2d 929 (2007)). Plaintiffs must allege sufficient facts to "nudge[ ] their claims across the line from conceivable to plausible." Twombly, 550 U.S. at 570. "The plausibility standard is not akin to a 'probability requirement,' but it asks for more than a sheer possibility that a defendant has acted unlawfully." Cohen v. Stevanovich, 772 F.

15

Supp. 2d 416, 423 (S.D.N.Y. 2010).  Though the court must accept
the factual allegations of a complaint as true, it is "not bound
to accept as true a legal conclusion couched as a factual
allegation." Iqbal, 556 U.S. at 678. (quoting Twombly, 550 U.S.
at 555).

## IV.  **Discussion**

Plaintiffs contend that the AC has adequately alleged
that (i) Defendants were statutory insiders of the Debtors at
the time of the Secured Credit Facility because they had
acquired their Capmark stock collectively with a group of
investors who together became members of GMACCH, a limited
liability company that owned approximately 74% of Capmark or
(ii) in the alternative, that Defendants were non-statutory
insiders in their own right.

On the other hand, Defendants contend that there is no
basis for Plaintiffs' statutory insider claims against the
Goldman Lenders as they are separate corporate entities from the
PIA Funds and The Goldman Sachs Group, and that no facts have
been alleged supporting veil piercing of these entities.  In
addition, Defendants argue that Plaintiffs have failed to

16

identify the basic elemebts of a non-statutory insider claim,
let alone allege facts that support one.  They seek the
dismissal of Plaintiffs' claims with prejudice.

### A) The Allegations Of The Statutory Insider Claims Are Insufficient

The Bankruptcy Code defines the term "insider" of a
corporate debtor as including a "(i) director," "(ii) officer,"
"(iii) person in control," "(iv) general partner" of the debtor,
"(v) a relative of" one of those, or an "affiliate, or an
insider of an affiliate as if such affiliate were the debtor."
11 U.S.C. §§ 101(31)(B), 101(31)(E).  An "affiliate" is an
"entity that directly or indirectly owns, controls, or holds
with power to vote, 20 percent or more of the outstanding voting
securities of the debtor . . . ."  11 U.S.C § 101(31)(2)(A).  In
addition, "the language of section 547(b)(4)(B) states that an
insider relationship is to be determined on the exact date of
the challenged transfer."  5 Collier on Bankruptcy ¶ 547.03[6]
n.113 (Alan N. Resnick & Henry J. Sommer eds., 16th ed. rev.).

"Where the allegedly inequitable conduct was committed
by an 'insider' of the debtor, that conduct will be 'rigorously
scrutinized' by the courts."  Pan Am Corp. v. Delta Air Lines,

17

Inc., 175 B.R. 438, 499 (S.D.N.Y. 1994) (citing cases). "Once the debtor produces material evidence of inequitable conduct by an insider, the burden of proof shifts to the insider to demonstrate the good faith and inherent 'fairness' of his conduct toward the debtor and the other creditors." Id.

Here, the AC does not allege that the Goldman Lenders, as distinct from the PIA Funds, fell within any of the statutory-insider categories set forth in 11 U.S.C. § 101(31). Plaintiffs have not alleged that any of the Goldman Lenders were (a) directors, officers, or general partners of a Debtor in the CFGI bankruptcy; (b) "person[s] in control" of a Debtor; or (c) affiliates, or insiders of an affiliate, of a Debtor. 11 U.S.C. §§ 101(31)(B), 101(31)(E). There are also no allegations that any Goldman Lenders had an ownership interest, managerial position, or any other role that allowed for control over a Debtor. Instead, Plaintiffs' allegations relate exclusively to the Goldman Lenders through the PIA Funds' 19.8% interest in GMACCH. (AC ¶¶ 85, 87). The AC therefore does not allege that the Goldman Lenders were, by themselves, statutory insiders.

In addition, the AC has not alleged that the PIA Funds held any equity interest in the Debtors or had any power to

18

manage the Plaintiffs' predecessors directly to be statutory
insiders.  The Plaintiffs have only alleged that the PIA Funds
held a 19.8% stake in GMACCH, a Delaware limited liability
company that in turn held 74% of the Debtors' equity.  (AC ¶¶
85, 87).  The allegation that the PIA Funds' equity stake in
GMACCH allowed the PIA Funds to "extensive[ly] control" GMACCH,
without more, is insufficient to demonstrate that PIA had actual
authority or control GMACCH required of a "person[s] in control"
claim under § 101(31)(B)(iii).  See In re 455 CPW Assocs., No.
99-5068, 225 F.3d 645, at *5 (2d Cir. Sept. 14, 2000) ("[C]ourts
have required evidence of extensive control before finding
insider status under [identical "person in control" provision
of] § 101 (31)(C)(v).").  Nor would that allegation, even if
true, establish that the PIA Funds had the substantial control
rights required for a 11 U.S.C. § 101(31)(B)(i) claim.  See In re
Wolverine, Proctor & Schwartz, LLC, 447 B.R. 1, 31 (Bankr. D.
Mass. 2011); In re Trenton Ridge Investors, LLC, 461 B.R. 440,
477 (Bankr. S.D. Ohio 2011).

        Plaintiffs aver that Rules 13d-3 and 13d-5 under the
Securities Exchange Act or 1934 (the "Exchange Act") render the
PIA Funds as statutory insiders. (Memo in Opp. at 10).
Specifically, Plaintiffs advance that if persons agree to act

19

together for the purposes of purchasing an issuer's shares, each person "'shall be deemed' to be the beneficial owner 'of all equity securities of that issuer beneficially owned by any' member of the group." Roth v. Jennings, 489 F.3d 499, 508 (2d Cir. 2007) (quoting 17 C.F.R. § 240.13d-5(b)(1)). By their terms, Rules 13d-3 and 13d-5 apply only for "purposes of Sections 13(d) and 13(g) of the [Exchange] Act," and are intended to ensure that stockholders cannot avoid reporting requirements in a corporate takeover.  17 C.F.R. § 240.13d-3, 13d-5; see CSX Corp. v. Children's Inv. Fund Mgmt. (UK) LLP, 654 F.3d 276, 283 n.6, 283-85 (2d. Cir. 2011) (explaining that Congress' purpose in enacting section 13(d) and Rule 13d-5 was "to insure that public shareholders who are confronted by a cash tender offer for their stock will not be required to respond without adequate information regarding the qualifications and intentions of the offering party.").

        The cases cited by Plaintiffs for the proposition that "courts have recognized Rule 13d in the bankruptcy context" (Memo. in Opp. at 10) do not suggest that Rules 13d-3 and 13d-5 under the Exchange Act should supplant the definition of "insider" set out in the Bankruptcy Code.  The Second Circuit has rejected similar attempts to supplant definitions set out in

20

the Bankruptcy Code with dissimilar definitions from the
Exchange Act. See Enron Creditors Recovery Corp. v. Alfa,
S.A.B. de C.V., 651 F.3d 329, 339 n.4 (2d Cir. 2011) (stating
that when a "case calls on us to interpret a provision of the
Bankruptcy Code. It makes little sense to look to a definition
from a different statutory scheme, particularly when that
definition contradicts the Bankruptcy Code's.").

        The AC therefore fails to adequately allege that the
Goldman Lenders or the PIA Funds were statutory insiders at the
time of the alleged preferential transfers.

Plaintiffs Have Not Alleged Facts that Support Veil Piercing

        Plaintiffs have not pled facts that would permit the
multiple corporate veils separating the Goldman Lenders, the PIA
Funds, and The Goldman Sachs Group to be disregarded.
Plaintiffs contend that they are not required to allege veil
piercing or alter ego theories to recover the preferential
transfers in the instant case. They aver that Goldman Sachs
Group "had a three-year, multi-faceted relationship with
Capmark, through various subsidiaries" and made no distinction
between its roles as an investor in and lender to Capmark[.]"

21

(Memo in Opp. at 12-13).   Alternatively, Plaintiffs assert that a federal common law of veil piercing applies here because the case is "solely on federal questions under Bankruptcy Code sections 547 and 550, and not diversity jurisdiction."   (Memo in Opp. at 13).

     "Well-established precedent holds that in order for one company to be held responsible for the actions of a related company, it is necessary that there be sufficient facts to pierce the corporate veil." Ins. Co. of N. Am. v. Cohn (In re Cohn), 54 F. 3d 1108, 1117 (3d Cir. 1995); see Clear Thinking Group LLC v. Brightstar US, Inc. (In re KCMVNO, Inc.), No. 08-10600 (BLS), Adv. Pro. No. 10-50730 (BLS), 2010 WL 4064832, at *3 (Bankr. D. Del. Oct. 15, 2010) (to survive a motion to dismiss a claim that an alleged insider's conduct can be imputed to an affiliated creditor, a plaintiff must allege facts sufficient to support veil piercing); see also Official Comm. of Unsecured Creditors of Champion Enters., Inc. v. Credit Suisse (In re Champion Enters., Inc.), No. 09-14014 (KG), Adv. Pro. No. 10-50514 (KG), 2010 WL 3522132, at *10 (Bankr. D. Del. Sept. 1, 2010) (dismissing insider claims based on insufficient veil-piercing allegations).

"Piercing the corporate veil is a state law theory of liability that requires facts establishing that a controlling entity ignored the separate legal status of, and dominated the affairs of, a controlled entity." Id. Under New York's choice of law rules, "the law of the state of incorporation determines when the corporate form will be disregarded." Fletcher v. Atex, Inc., 68 F.3d 1451, 1456 (2d Cir. 1995) (citation and internal quotation marks omitted). Thus, Delaware law governs the analysis for Goldman Sachs Lending Partners LLC (a Delaware LLC) and Goldman Sachs Credit Partners, L.P. (a Bermuda limited partnership with a Delaware LLC as its general partner); New York law governs the analysis for the Goldman Sachs Mortgage Company (a New York limited partnership with a New York corporation as its general partner); and Nova Scotia law governs the analysis for Goldman Sachs Canada Credit Partners Co. (a Nova Scotia unlimited company). See e.g., NetJets Aviation, Inc. v. LCH Commc'ns, LLC, 537 F.3d 168, 177 (2d Cir. 2008) (Delaware law governs veil-piercing claims involving Delaware LLCs); In re Digital Music Antitrust Litig., 812 F. Supp. 2d 390, 418 (S.D.N.Y. 2011) (New York law governs veil-piercing claims against New York corporations); Presbyterian Church of Sudan v. Talisman Energy, Inc., 453 F. Supp. 2d 633, 684-87 (S.D.N.Y. 2006) (applying the laws of Mauritius and The

23

Netherlands to corporations organized under those countries'
laws).

A claim premised on veil piercing can survive a motion
to dismiss if the complaint alleges facts sufficient to show
that (1) the parent exercised "complete domination and control"
over the subsidiary such that the subsidiary had no "legal or
independent significance of [its] own," and (2) the corporate
form was used to perpetrate some form of injustice or fraud.
Wallace v. Wood, 752 A.2d 1175, 1183 (Del. Ch. 1999); see also
Fletcher, 68 F.3d at 1457-58 (under Delaware law, veil piercing
requires a dual showing that the parent and subsidiary "operated
as a single economic entity" such that subsidiary was a "mere
instrumentality," and "that an overall element of injustice or
unfairness is present"); MAG Portfolio Consult, GMBH v. Merlin
Biomed Group LLC, 268 F.3d 58, 63 (2d Cir. 2001) ("[U]nder New
York law, a court may pierce the corporate veil where 1) the
owner exercised complete domination over the corporation with
respect to the transaction at issue and 2) such domination was
used to commit a fraud or wrong that injured the party seeking
to pierce the veil." (citations omitted)); Miller Thomson LLP,
Business Laws of Canada § 2:6 (2011) ("[T]he remedy of piercing
or lifting the corporate veil is to be used only in the most

24

exceptional circumstances, such as cases involving fraud or
flagrant injustice, a corporation being used for a sham for the
individuals behind it, or based on principles of agency.").

        In addition, the standard for veil-piercing is very
demanding.  Thus, "[d]isregard of the corporate form is
warranted only in extraordinary circumstances, and conclusory
allegations of dominance and control will not suffice to defeat
a motion to dismiss."  Societe d' Assurance de l'Est SPRL v.
Citigroup, Inc., No. 10 Civ. 4754 (JGK), 2011 WL 4056306, at *5
(S.D.N.Y. Sep. 13, 2011).  "The unadorned invocation of dominion
and control is simply not enough" to state a claim premised on
veil piercing. In re Digital Music Antitrust Litig., 812 F.
Supp. 2d at 419 (dismissing veil-piercing claims under New York
and Delaware law); see also Crosse v. BCBSD, Inc., 836 A.2d.
492, 497 (Del. 2003) (affirming dismissal of veil-piercing claim
where a plaintiff failed to "plead facts supporting an inference
that the corporation, through its alter-ego, has created a sham
entity designed to defraud investors and creditors").

        Courts evaluating insider status under the Bankruptcy
Code have applied veil-piercing law.  See e.g., In re Enter.
Acquisition Partners, 319 B.R. 626, 634 (9th Cir. BAP 2004)

(finding that "[s]tate law controls whether it is appropriate
for the bankruptcy court to pierce the corporate veil" in the
context of a statutory insider preference claim); Stern v. Singh
Factors, LLC (In re Shore to Shore Realty, Inc.), No. 8-08-
72760-reg, Adv. Proc. No. 8-09-08296-reg, 2011 WL 350526, at *5-
6) (Bankr. E.D.N.Y. Feb. 1, 2011) (applying New York veil-
piercing law to a section 548 fraudulent transfer claim); see
also In re Champion, 2010 WL 3522132, at *9-10 (applying state
veil-piercing law in an equitable subordination case).  This
practice is consistent with the well-established principle that
any interest in the uniform application of federal statutes is
"insufficient to justify displacing state law in favor of a
federal common law rule."  New York v. National Service Indus.
Inc., 460 F.3d 201, 208-09 (2d Cir. 2006) (internal quotation
marks omitted).


        As a threshold matter, Plaintiffs have contended that
a veil-piercing requirement "would effectively destroy
preference liability whenever an investor uses a separate
lending entity to make and receive loan payments." (Memo in Opp.
at 10).  However, as discussed above, facts must be alleged to
support a showing of domination, fraud or injustice.  Thus, a
basis for veil piercing exists when an investor exercises

sufficient dominion over a lender to use that entity for its own
fraudulent or unjust purposes.

Moreover, in Miller Avenue Professional and
Promotional Services v. Brady (In re Enterprise Acquisition
Partners, Inc.), the Ninth Circuit Bankruptcy Appellate Panel
considered and rejected Plaintiff's position that a parent
company's insider status claims can be imputed to its subsidiary
absent veil piercing.  319 B.R. 626, 629 (9th Cir. BAP 2004).
In overturning the bankruptcy court's decision, the Bankruptcy
Appellate Panel held that ""[t]he only way for [the corporation]
to qualify as a per se insider is for the corporate form to be
disregarded and for the [corporation] to be treated as one and
the same as [the statutory insider]." Id. at 633.  Absent a
basis for veil piercing, the court explained, "there is no
justification for expanding the definition of per se insider
beyond what is plainly contained in the statute."  Id. at 632-
33.

Plaintiffs have also suggested that "Congress'
adoption of the Bankruptcy Act demonstrated an intent to impose
uniform federal laws on the subject of fraudulent transfers and
preferences in bankruptcy." (Memo in Opp. at 14).  However, in

27

Butner v. United States, upon which the Plaintiffs rely, the
Supreme Court noted that "[p]roperty interests are created and
defined by state law[,]" and thus in the narrow context of
ownership interests in mortgaged property, "[u]nless some
federal interest requires a different result, there is no reason
why such interests should be analyzed differently simply because
an interested party is involved in a bankruptcy proceeding."
440 U.S. 48, 55, 99 S. Ct. 914, 59 L. Ed. 2d 136 (1971).

          Plaintiffs cite to no authority that supports the use
of a federal veil-piercing standard in actions arising under the
Bankruptcy Code or any case holding that a federal veil-piercing
standard displaces state law standards in cases arising under
federal law.  While Plaintiffs have cited several admiralty
cases in their opposition for the proposition that federal veil-
piercing law applies, admiralty cases, unlike cases arising
under the Bankruptcy Code, "do[] not 'arise' under the
Constitution or the laws of the United States." Universal Oil
Ltd. v. Allfirst Bank (In re Millenium Seacarriers, Inc.), 419
F.3d 83, 101 (2d Cir. 2005) (internal quotation marks omitted).
Additionally, Plaintiffs' citation to Southern New England
Telephone Co. v. Global NAPs Inc. is inapposite because the
Second Circuit did not address the question of whether state or

federal law applies to veil-piercing allegations in a cases involving the Telecommunications Act. 624 F.3d 123, 138-39 (2d Cir. 2010). Finally, Statek Corp. v. Development Specialists, Inc. (In re Coudert Bros, LLP) is contrary to Plaintiffs' position, as the court explained that "federal common law should be applied only where there is 'a significant conflict between some federal policy or interest and the use of state law.'" 673 F.3d 180, 188 (2d Cir. 2012) (quoting Bianco v. Erkins (In re Gaston & Snow), 243 F.3d 599, 606 (2d Cir. 2001)); see also Id. (stating that the Second Circuit "loath to use" federal common law to displace state law).

Moreover, even under federal common law, courts will veil pierce only in extraordinary circumstances," and must find either fraud or that a defendant "so dominated and disregarded [its alter ego's] corporate form that the alter ego was actually carrying on the controlling party's business instead of its own." Arctic Ocean Int'l, Ltd. v. High Seas Shipping, Ltd., 622 F. Supp.2d 46, 53 (S.D.N.Y. 2009) (alterations in original) (quoting Kirno Hill Corp. v. Holt, 618 F.2d 982, 985 (2d Cir. 1980); Dolco Invs. Ltd. v. Moonriver Dev., Ltd., 486 F. Supp. 2d 261, 271 (S.D.N.Y. 2007)).

29

Where a plaintiff seeks to disregard the corporate formalities separating horizontal affiliates such as the Goldman Lenders and the PIA Funds, the veils separating each entity from the shared corporate parent must be pierced.  See Presbyterian Church of Sudan, 453 F. Supp.2d at 689 (conducting separate veil-piercing analysis at each subsidiary); see also Outokumpu Eng'g Enters., Inc v. Kvaerner Enviropower, Inc., 685 A.2d 724, 729 (Del. Super. 1996) (stating that in order to disregard corporate formalities separating "sister" subsidiaries, a plaintiff must first pierce the veil separating one subsidiary from its corporate parent, and then surmount "another barrier" by piercing the veil separating the corporate parent from the second subsidiary).

The AC concedes that The Goldman Sachs Group may be a minority investor in the PIA funds. (See AC ¶ 69) ("The Goldman Sachs Group at least partly owns each of the Controlled Goldman Affiliates, and committed at least thirty percent (30%) of the funds for GS Capital Partners V, L.P."). The AC fails to present facts to adequately allege the "double-pierce" required to lump together two "sister" subsidiaries, the Goldman Lenders and the PIA Funds, even under the liberal notice pleading standard.

30

The facts that Plaintiffs have alleged concerning the relationships between The Goldman Sachs Group, the Goldman Lenders and the PIA Funds also fall short of showing the "complete domination and control" required to state a veil-piercing claim. Plaintiffs have not alleged any facts that would establish that the corporate formalities separating the Goldman Lenders, the PIA Funds, and The Goldman Sachs Group were in any way disrespected. The allegation that the separate corporate forms of The Goldman Sachs Group, Inc., the Goldman Lenders, and the PIA Funds "had no meaning or significance" (AC ¶ 74) are conclusory, without any allegation that funds were commingled, that the Goldman Lenders or the PIA Funds were inadequately capitalized, or that any other corporate formalities (such as maintaining separate books and records, or maintaining a functioning board of directors for each subsidiary) were not respected. Such allegations are necessary to a veil-piercing claim. See NetJets Aviation, 537 F.3d at 177 (a veil-piercing inquiry turns on "whether those in control of a corporation did not treat the corporation as a distinct entity" by disregarding corporate formalities) (internal citation and quotation marks omitted); Morris v. N.Y. State Dep't of Taxation

31

and Fin., 82 N.Y.2d 135, 141 (N.Y. 1993) ("[C]omplete domination
of the corporation is the key to piercing the corporate veil").

The AC's allegations do not allege facts beyond
relationships "typical of a majority shareholder or parent
corporation" which courts have found to be insufficient to veil
piercing as a matter of law. Fletcher, 68 F.3d at 1459-60. The
Supreme Court has noted that, "it is hornbook law that the
exercise of the control which stock ownership gives to the
stockholders . . . will not create liability beyond the assets
of the subsidiary." United States v. Bestfoods, 524 U.S. 51,
61-62, 118 S. Ct. 1976, 141 L. Ed. 2d 43 (1998). For these
purposes, "control" includes "the election of directors, the
making of by-laws, and the doing of all other acts incident to
the legal status of stockholders. Nor will duplication of some
or all of the directors or executive officers be fatal." Id. at
62. Under New York and Delaware law, "[t]he separate corporate
existences of parent and subsidiary will not be set aside merely
on a showing of common management of the two entities, nor on a
showing that the parent owned all the stock of the subsidiary."
In re Digital Music Antitrust Litig., 812 F. Supp. 2d at 418.

32

The allegations of the AC that the Goldman Lenders share employees and legal and risk-management personnel with The Goldman Sachs Group (AC ¶ 75) are insufficient to show complete domination and control. That a subsidiary shares employees, officers, and directors with a parent does not permit the corporate form to be disregarded. E.g., Waite v. Schoenbach, No. 10 Civ. 3439 (RMB), 2010 WL 4456955, at *10 (S.D.N.Y. Oct. 29, 2010) (finding allegation that parent and subsidiaries "operate at the same location and share employees, officers, owners, and bank accounts" insufficient to support veil piercing) (internal quotation marks omitted); Kain v. Xanboo, Inc., 526 F. Supp. 2d 392, 404 (finding that allegations of a common address, common ownership, and common principals, without more, are insufficient to pierce the corporate veil); In re Champion, 2010 WL 3522132, at *10 (stating that the mere fact that "the same employees" of the parent and subsidiary managed the transactions at issue was insufficient to pierce the corporate veil); Mobil Oil Corp. v. Linear Films, Inc., 718 F. Supp. 260, 267 (D. Del. 1989) (holding that a corporation and its subsidiary were not "alter egos" where, inter alia, subsidiary and parent "shared common officers and directors"). Similarly, public relations copy from The Goldman Sachs Group website referring to "Goldman Sachs's different practice areas .

33

. . as 'business segments'" (AC ¶ 73) and statements that employees are compensated based on the performance of "the firm as a whole" (AC ¶ 75) are insufficient to veil pierce. See e.g., Fletcher, 68 F.3d at 1460-61 (finding statements in advertising materials insufficient to veil pierce, and further finding that documents describing a subsidiary as a "division" did not support veil piercing).

The Plaintiffs have also not adequately alleged the second, independent element of a veil-piercing claim that The Goldman Sachs Group used its subsidiaries' corporate forms as a "sham" to perpetrate a "fraud or injustice." NetJets Aviation, 537 F.3d at 183; Morris, 82 N.Y.2d at 142 (in addition to domination, plaintiff must show "that the owners, through their domination, abused the privilege of doing business in the corporate form to perpetrate a wrong or injustice against [plaintiff]"). The AC does not allege facts that the Goldman Lenders or the PIA Funds are "sham" entities, nor that they exist as "vehicle[s] for fraud." See Am. Fuel Corp. v. Utah Energy Dev. Co., 122 F.3d 130, 135 (2d Cir. 1997) (because incorporation of a shell corporation was not a "sham," it did not meet the "fraudulent or wrongful conduct" requirement for veil piercing).

34

Taken together, neither the AC nor Plaintiffs'
opposition identifies any facts adequately alleging the piercing
of the veil separating the Goldman Lenders, the PIA Funds and
The Goldman Sachs Group. In the absence of adequate factual
allegations sufficient to raise a plausible inference that
either prerequisite for veil piercing is present, the statutory
insider claim is dismissed.

## B) The Allegations Of the Non-Statutory Insider Claim Are Insufficient

In evaluating whether an entity is a non-statutory
insider, courts examine two factors: "(1) the closeness of the
relationship between the debtor and the transferee, and (2)
whether the transactions between the transferee and the debtor
were conducted at arm's length." In re A. Tarricone, Inc., 286
B.R. at 262; Bruno Machinery Corp. v. Troy Die Cutting Co. (In
re Bruno Machinery Corp.), 435 B.R. 819, 833 (Bankr. N.D.N. Y.
20 I0); see also Shubert v. Lucent Techs. Inc. (In re Winstar
Commc'ns, Inc.), 554 F.3d 382, 396-97 (3d Cir. 2009) (to
establish that a creditor is a non-statutory insider, a
plaintiff must demonstrate both "[(1)] a close relationship
between debtor and creditor and ... [(2)] anything other than

35

closeness to suggest that any transactions were not conducted at arm's length" (citation and internal quotation marks omitted)).

The legislative history of § 101(31)(B) illustrates that Congress was concerned with situations in which "[a]n insider . . . has a sufficiently close relationship with the debtor that his conduct is made subject to closer scrutiny than those dealing at arms length with the debtor." S. Rep. No. 95-989, 1978 WL 8531, U.S. Code Cong. & Admin. New 1978, at 5787, 5810. Bankruptcy courts have accordingly "focused on the closeness between the transferee and the debtor, the degree of control or influence the transferee exerts over the debtor, and whether the transactions were conducted at arms length." In re Oakwood Homes Corp., 340 B.R. 510, 523-24 (Bankr. D. Del. 2006).

With regard to the Goldman Lenders' relationship with the Debtors Plaintiffs, the Plaintiffs allege no more than that the Goldman Lenders were ordinary commercial lenders that participated in a lending syndicate. The allegations concerning the Goldman Lenders' relationship with the Debtors are that (1) the Goldman Lenders held positions in two widely syndicated 2006 Capmark credit facilities; (2) one of the Goldman Lenders served as documentation agent for one of the 2006 credit facilities and

36

joint lead arranger and bookrunner on the other; and (3) the Goldman Lenders, along with several other lenders, took part in the 2009 Secured Credit Facility transaction. (AC ¶ 31, 39, 45). These allegations do not suggest that the Goldman Lenders had a "close" relationship with the Debtors, or that the Goldman Lenders exercised anything resembling the high level of control required for non-statutory insider status. See Official Comm. of Unsecured Creditors of the Debtors v. Austin Fin. Servs., Inc. (In re KDI Holdings. Inc.), 277 B.R. 493, 511 (Bankr. S.D.N.Y. 1999) (finding that a creditor is held to an insider standard only "where it is found that it dominated and controlled the debtor"); In re Champion, 2010 WL 3522132, at *6 (insider status may be "established by facts showing that the lender dictated day-to-day management and operation of the debtor or made decisions for the debtor regarding replacement of management or filing for bankruptcy").

Plaintiffs contend that other transactions involving the Goldman lenders and Capmark are relevant. (Memo in Opp. at 20). However, because section 547(b)(4)(B)'s one-year preference period applies only if a creditor was an insider "at the time of" the allegedly preferential transfer, 11 U.S.C. § 547(b)(4)(B), and because there were no other transactions

37

involving the Goldman Lenders and CFGI at the time the allegedly preferential transfer was made, the only transaction that may properly be considered in evaluating whether the Goldman Lenders played no active role, and which has already been determined to have taken place at arm's length.  5 Collier on Bankruptcy ¶ 547.03[6] n.113 (Alan N. Resnick & Henry J. Sommer eds., 16th ed. 2010) (emphasizing that the "point in time when the transferee was an insider is critical" and that "[t]he language of section 547(b)(4)(B) clearly states that an insider relationship is to be determined on the exact date of the challenged transfer" (internal quotation marks omitted)).

        The case upon which the Plaintiffs principally rely, considered whether a "close personal friendship" gave rise to statutory insider status and the court expressly distinguished cases "involving a bank or other institutional lender where control is the sole basis for a finding of insider status." Hirsch v. Tarricone (In re A. Tarricone, Inc.), 286 B.R. 256, 266 (Bankr. S.D.N.Y. 2002).  The allegations that Plaintiffs argue support a "close relationship" between Capmark and the Goldman Lenders involve the PIA Funds, not the Goldman Lenders. As discussed above, however, the AC has not adequately alleged veil-piercing allegations that would attribute the PIA Funds'

conduct to the Goldman Lenders. See Wilen v. Pamrapo Savings Bank, S.L.A. (In re Bayonne Medical Ctr.), 429 B.R. 152, 182-85 (Bankr. D.N.J. 2010) (finding no non-statutory insider status despite facts that four members of the debtor's board of trustees were affiliated with the bank-creditor, and the bank-creditor was found to have dealt at less than arm's length with the debtor in a later transaction).

Additionally, courts routinely dismiss non-statutory insider claims. See e.g., In re KCMVNO, 2010 WL 4064832, at *5 (dismissing non-statutory insider preference claim because plaintiffs "stat[ed] bare conclusions and . . . failed to allege sufficient facts from which the Court could infer" no-statutory insider status); In re Champion, 2010 WL 3522132, at *6-8 (dismissing equitable subordination claim; complaint failed to allege facts that would permit court to infer non-statutory insider status); Lyme Regis Partners, LLC v. Icahn (In re Blockbuster Inc.), No. 10-14997 (BRL), Adv. Proc. No. 10-05523 (BRL), 2011 WL 1042767, at *3 (Bankr. S.D.N.Y. Mar. 17, 2011) (dismissing equitable subordination claim where complaint "fail[ed] to allege facts sufficient to show that [defendants] were non-statutory insiders, nor has it adequately pled any sort of close relationship that would justify such a conclusion.").

39

Plaintiffs cannot save their non-statutory insider claim by arguing that non-statutory insider status requires a "fact-intensive inquiry that is ordinarily not resolvable on a motion to dismiss." (Memo in Opp. at 19). No factual inquiry is required or appropriate where, as here, Plaintiffs fail to allege facts that would support non-statutory insider status.

Plaintiffs' non-statutory insider claim additionally fails because Plaintiffs are judicially estopped from taking a position directly counter to the position they took, persuaded Judge Sontchi to adopt, and benefited from in the Capmark Bankruptcy. See, e.g., Adelphia Recovery Trust v. HSBC Bank USA (In re Adelphia Recovery Trust), 634 F.3d 678, 697-99 (2d Cir. 2011) (finding that judicial estoppel barred litigation trust from maintaining a position contrary to earlier position taken by debtor-in-possession).

In Adelphia, for example, the debtor participated in a sale of assets "free and clear" of any banks' liens but did not disclose to the court the possibility that it would soon bring fraudulent conveyance claims against the banks. Adelphia, 634 F.3d at 685-86. As a result of this non-disclosure, the banks did not object to the sale, and the court approved the sale

40

although most of the banks were not even present at the sale

hearing.  Less than three months after the asset sale, the

debtor brought fraudulent conveyance claims against the banks.

Id. at 682.  The Second Circuit judicially estopped the claims.

Id. at 697-98.  The Court held that because "unfair advantage to

the potentially prejudiced party's adversary . . . is the

touchstone of the judicial estoppel doctrine," a court must

"focus on the conduct of the party to be estopped."  Id. at 698-

99 (emphasis in the original).  The debtor and its post-

emergence litigation trust, the Court found, had obtained an

unfair advantage by (1) facilitating and expediting the asset

sale while remaining silent about the fraudulent conveyance

claims, and then (2) bringing the fraudulent conveyance claims

shortly after the asset sale. Judicial estoppel, accordingly,

was appropriate.  (Id.).


     Judicial estoppel bars a party from (i) taking a

position that is "clearly inconsistent" with an earlier

position, (ii) where the party's former position was accepted by

a court in an earlier proceeding, and (iii) where, by taking the

position, the party would derive an "unfair advantage" or impose

an "unfair detriment" on the opposing party. New Hampshire v.

Maine, 532 U.S. 742, 750-51, 121 S. Ct. 1808, 149 L. Ed. 2d 968

41

(2001). Notably, because the purpose of judicial estoppel is to "'protect the integrity of the judicial process by prohibiting parties from deliberately changing positions according to the exigencies of the moment,'" it applies "not only when [a party] knowingly lies but when it takes a position in the short term knowing that it may be on the verge of taking an inconsistent future action." Adelphia, 634 F.3d at 696. The principle has been applied to reorganized debtors. See Kunica v. St. Jean Fin., Inc., 233 B.R. 46, 58 (S.D.N.Y. 1999) (citing cases judicially estopping reorganized debtors based on their conduct as debtors)

          Judicial estoppel does not require that a court expressly assume a party's position in formulating its opinion or issue a final decision on the merits. It is enough that the court accept the accuracy of a party's representation and that the court "might have" made a different decision had the party not taken that position. New Hampshire, 532 U.S. at 752 (finding the court's acceptance of a consent decree estopped a party from taking a position contrary to the position it took to facilitate that acceptance); Adelphia, 634 F.3d at 696 (applying judicial estoppel where court "accepted the accuracy of the litigant's statements"); Kunica, 233 B.R. at 59 (stating that a

bankruptcy court's decision to dismiss case constituted "adoption" of debtor's representations regarding assets; had debtor disclosed certain assets, court "might have" ordered different relief).

Plaintiffs contend that despite their prior actions, the bankruptcy court settlement "expressly carved out for later prosecution the very claims subject to this action." (Memo in Opp. at 24 (emphasis omitted)). However, Plaintiffs did not represent to the bankruptcy court that they could not bring the instant preference claims in the bankruptcy proceeding, but abandoned those claims in that proceeding. Instead, in order to secure a settlement that saved the Debtors' estates "approximately $320 million" and paved the way for Plaintiffs' emergence from bankruptcy, In re Capmark Fin. Group Inc., 438 B.R. 471, 513 (Bankr. D. Del. 2010), Plaintiffs represented to the Delaware Bankruptcy Court that the Secured Credit Facility was negotiated at "arm's length"; that the negotiations that preceded the Secured Credit Facility transaction were "hard-fought, and often contentious"; that the terms of that transaction were "market terms that would be expected in an arm's-length transaction between a company comparable to Capmark and third-party financing sources in 2009" (Debtors' Proposed

43

Findings and Conclusions, at 35, 38), and that the "2009
Transaction" was "above-board" (Debtors' Rule 9019 Reply, 87
n.49). Plaintiffs now assert a claim that requires the Secured
Credit Facility to have been a non-arms-length transaction. (AC
¶ 101).

Specifically, the Delaware Bankruptcy Court accepted
and adopted Plaintiffs' position concerning the arm's-length
nature of the Secured Credit Facility transaction in its
November 1, 2010 Findings and Conclusions. Judge Sontchi not
only accepted the accuracy of Plaintiffs' position concerning
the arm's-length nature of the Secured Credit Facility
transaction, but his finding of fact on that subject tracked
Plaintiffs' proposed finding of fact verbatim. (AC ¶¶ 49, 52).
Plaintiffs now advocate that their non-statutory insider claim
requires a finding that the Secured Credit Facility negotiations
were not conducted at arm's length, see e.g., In re A.
Tarricone, Inc., 286 B.R. at 262; Adelphia, 634 F.3d at 697-98
(finding representations made on behalf of a debtor "clearly
inconsistent" where those claims could not be reconciled with
the debtor's prior representations).

44

Plaintiffs also received a benefit by representing to the Delaware Bankruptcy Court that the Secured Credit Facility was negotiated at arm's length. Their representations made the court far more likely to approve the settlement, which, in turn, saved Plaintiffs approximately $320 million and cleared the way for their emergence from bankruptcy. In re Capmark Fin. Group, 438 B.R. at 513. If Plaintiffs had not taken the position that the Secured Credit Facility transaction was negotiated at arm's length, the constructive fraudulent transfer claim that the Committee sought standing to pursue, as well as potential actual fraudulent transfer and equitable subordination claims, which were released by the settlement, may have been strengthened. Sharp Int'l Corp. v. State Street Bank & Trust Co. (In re Sharp Int'l Corp.), 403 F.3d 43, 54-55 (2d Cir. 2005) (analyzing "good faith" element of "fair consideration" under N.Y. Debt. & Cred. L. § 272, and contrasting repayment of debt to an outsider to repayment of debts to insiders); Nisselson v. Softbank AM Corp. (In re Marketxt Holdings Corp.), 361 B.R. 369, 387 (Bankr. S.D.N.Y. 2007) (finding factors relevant to determining whether a creditor is subject to equitable subordination include "whether the relationship between the debtor and lender was the result of an arm's-length transaction"); MFS/Sun Life Trust-High Yield Series v. Van Dusen Airport Services Co., 910 F. Supp.

45

913, 935 (S.D.N.Y, 1995) (holding that challenged transfers were part of "an arm's-length transaction" showed absence of intent to defraud creditors). Judicial estoppel now bars Plaintiffs from contradicting their prior representation to the bankruptcy court that the Secured Credit Facility transaction was negotiated at arm's length.

## C) Conclusion

Based on the conclusions set forth above and the prior proceedings, the motion of the Goldman Lenders is granted and the AC is dismissed with prejudice.

**New York, NY**
**April ⌇, 2013**

ROBERT W. SWEET
U.S.D.J.

46